**Johnny Clint WIGGINS, James Martin Garner and Edward Eugene Little, Appellants,**

**v.**

**Willis SARGENT, Warden; Larry Norris, Assistant Warden; Robert Tansy, Assistant Warden; and Major Larry Young, Cummins Unit, Arkansas Department of Correction, Appellees.**

**Robert FROST, Terry Wilson and Bobby Joe Fruit, Appellants,**

**v.**

**A.L. LOCKHART, Director, Arkansas Department of Correction; and Willis H. Sargent, Warden, Cummins Unit, Arkansas Department of Correction, Appellees.**

**No. 84–1046.**

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 14, 1984.

Decided Jan. 28, 1985.

J. Harrod Berry, Little Rock, Ark., for appellants.

A. Carter Hardage, Little Rock, Ark., for appellees.

Before ARNOLD, Circuit Judge, HENLEY, Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.

HENLEY, Senior Circuit Judge.

Johnny Clint Wiggins and other inmates from the Cummins Unit of the Arkansas Department of Correction appeal from the district court's dismissal of their civil rights action. 42 U.S.C. § 1983. The inmates contend that prison officials have refused to allow them to receive religious literature and to correspond with religious leaders in violation of their first amendment rights. They also allege that the officials neither allow them to visit with their religious leaders nor to congregate for religious services. The district court held that since the inmates' beliefs were not "religious in nature," they were entitled to no first amend-

ment protection. We reject this conclusion and remand for further proceedings.

## BACKGROUND

The inmates complain that prison officials unconstitutionally denied them access to religious literature and correspondence from their religious leaders and that they have been denied reasonable opportunities to practice their faith. The prison administration responds that the inmates' beliefs are not religious and that the materials were withheld because they constitute a threat to good order and discipline within the institution.

A hearing was held before a magistrate with the inmates appearing pro se.[1] Since it was undisputed that the prison officials withheld the materials and refused to allow the inmates to meet for worship and visit with their pastor, the hearing focused on the inmates' beliefs. The inmates are followers of the Church of Jesus Christ Christian and are students of the Sword of Christ Good News Ministries.

The Church of Jesus Christ Christian has some affiliation or connection with an organization known as Aryan Nations,[2] although the extent of the connection is unclear from the record. Aryan Nations was founded by Richard Butler. Butler succeeded Wesley Swift as pastor of the Church of Jesus Christ Christian in the early 1970's. Swift was the original founder of the church. Although both the church and Aryan Nations share similar beliefs, particularly a belief in the superiority of the white race, it also appears that Aryan Nations is primarily a loosely organized political entity while the Church of Jesus Christ Christian is the religious body. Donald Tauer, a member of Aryan Nations, testified that the Church of Jesus Christ Christian is affiliated with Aryan Nations and that both are headquartered in Hayden Lake, Idaho. However, he also stated that the two are separate organizations and that one does not have to be a member of Aryan Nations in order to follow the teachings of the church. Tauer further testified that prison officials refused to allow the inmates to receive a Bible study course he had sent to them.[3] The Church of Jesus Christ Christian has several buildings, a school, and a parsonage in Idaho.

The Sword of Christ Good News Ministries is mainly an evangelical ministry with Ralph Forbes as pastor. Forbes testified that his church is not really affiliated with Aryan Nations, but that they do share similar beliefs. Forbes, an ordained Baptist minister, stated that his was a circuit-riding ministry and that he holds Bible study courses and meetings at different locations. He testified that religious materials, Bible study courses, and letters he has sent to the inmates have been returned to him by prison authorities and that he has had no response to his requests for visitation permits.

As stated, the beliefs of the Church of Jesus Christ Christian and the Sword of Christ Good News Ministries are similar. They believe that the Bible is the inspired word of God and interpret its doctrines literally. Although it is believed that God created various races and that all of these races are "good," the white race consists of God's chosen people. They believe that they are the literal and spiritual descendants of Abraham and the "lost tribes" of Israel. They advocate racial purity and believe that race mixing is a sin which is contrary to Biblical teachings.

The district court adopted the recommendation of the magistrate. The court stated that, in order to merit first amendment protection, the inmates' beliefs must be both sincerely held and religious in nature. While the court did not "doubt the religious sincerity of the individual plaintiffs or that

---

1. The magistrate denied the inmates' request for appointment of counsel. Wiggins acted as spokesman for the inmates at the hearing.

2. There is no evidence that Aryan Nations has any connection with the prison inmate gang known as the "Aryan Brotherhood," which is

mentioned in some of the caselaw. *See United States v. Abel,* —— U.S. ——, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984).

3. Wiggins stated that he received only the first five lessons of a sixteen lesson course.

they truly believe in the philosophy of the Aryan Nation," it nevertheless held that the beliefs were "more a rejection of the traditional secular viewpoint of western civilization than a deeply rooted religious belief...." It therefore found that the notion of white supremacy was secular and that "[m]aking such a notion more palatable by cloaking it in the garb of fundamentalist Christianity may result in attracting followers and creating the appearance of spiritual credibility, but it does not warrant the protection of the free exercise clause of the First Amendment."

## DISCUSSION

■ The district court was correct in noting that only sincerely held beliefs which are "rooted in religion" are protected by the free exercise clause. *Thomas v. Review Bd. of the Indiana Employment Security Division*, 450 U.S. 707, 713, 101 S.Ct. 1425, 1429, 67 L.Ed.2d 624 (1981); *Wisconsin v. Yoder*, 406 U.S. 205, 215–16, 92 S.Ct. 1526, 1533–34, 32 L.Ed.2d 15 (1972). First amendment religious protection is not extended to "so-called religions which tend to mock established institutions and are obviously shams and absurdities and whose members are patently devoid of religious sincerity." *Theriault v. Carlson*, 495 F.2d 390, 395 (5th Cir.1974). "However, the resolution of that question is not to turn upon a judicial perception of the particular belief or practice in question; religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Thomas*, 450 U.S. at 714, 101 S.Ct. at 1430; *United States v. Seeger*, 380 U.S. 163, 184–85, 85 S.Ct. 850, 863–64, 13 L.Ed.2d 733 (1965); *United States v. Ballard*, 322 U.S. 78, 86, 64 S.Ct. 882, 886, 88 L.Ed. 1148 (1944) ("Men may believe what they cannot prove".). The determination of

whether a belief is religious or not is an extremely delicate task which must be approached with caution. A court is not to determine religious orthodoxy. *Teterud v. Burns*, 522 F.2d 357, 360 (8th Cir.1975).

■ From a review of the limited evidence presented at the hearing, we believe that the district court may have erred in its conclusion that the inmates' beliefs are purely secular. Followers of the churches involved here base their beliefs directly on literal interpretations of fundamentalist Christian theology. They believe that the Bible teaches that race mixing is a sin. However "unpalatable" such ideas are, it is not a court's prerogative to determine the validity of such beliefs. The belief system here has its own orders of worship and Articles of Faith, not to mention the fact that it has outside-the-prison organization and followers. It has its own religious dogma, hierarchy, and mandated lifestyle. It also appears that the inmates' religion may be comprehensive and that it may address fundamental and ultimate questions. *Cf. Africa v. Commonwealth of Pennsylvania*, 662 F.2d 1025 (3d Cir. 1982).[4]

Moreover, the district court seemed to be under the mistaken impression that an idea or belief cannot be both secular and religious. It apparently grounded its conclusion on the rationale that since the notion of white supremacy was secular, it could not also be religiously based. "But a coincidence of religious and secular claims in no way extinguishes the weight appropriately accorded the religious one." *Callahan v. Woods*, 658 F.2d 679, 684 (9th Cir. 1981). In other words, a belief can be both secular and religious. The categories are not mutually exclusive.[5] The first amend-

---

**4.** The district court relied heavily on *Africa* in reaching its conclusions. Inmate Africa sought a special diet consisting entirely of raw foods and based his request upon his membership in an organization called MOVE. MOVE was founded inside the prison by Africa and had no official organization, no governing body, no official hierarchy, no existing regime or condoned lifestyle, no religious credo, and no distinct reli-

gious ceremonies or rituals. *Africa*, 662 F.2d at 1026–27. Africa simply believed that everything he did had religious significance. It is quite apparent that *Africa* is distinguishable from the case at bar.

**5.** "The devout Seventh-Day Adventist may enjoy his Saturday leisure; the Orthodox Jew or Mohammedan may dislike the taste of pork. Such personal considerations are irrelevant to an

ment presumably protects the area where the two overlap. *Id.* We believe that in this case the fact that the notion of white supremacy may be, and perhaps usually is, secular, in the sense that it is a racist idea, does not necessarily preclude it from also being religious in nature, in the sense that it may be based upon a literal interpretation of Biblical teachings.[6]

The district court also appears to have been confused about the interrelationship between the churches and the Aryan Nations organization. Our review of the record leaves us with similar confusion. The distinction may be important since Aryan Nations is primarily a secular political entity. On the other hand, as we have noted, an idea can be both secular and religious and still be entitled to free exercise clause protection.

In short, due to the inadequacy of the testimony to decide the issue, and in view of the district court's apparent misconception concerning the interrelationship of secular and religious ideas, we believe the court should reexamine the entire issue of whether the inmates' beliefs are religious and whether they are therefore entitled to some free exercise clause protection.[7]

There is an equally fundamental error in holding that the inmates had no first amendment interests which were implicated by the prison administrators' actions here. Even apart from any religious significance the censored materials may have, they may have independent first amendment protection through the guarantee of freedom of speech. Prisoners enjoy a limited right to receive mail from persons outside the prison.[8] *E.g., Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *Jensen v. Klecker,* 648 F.2d 1179, 1182 (8th Cir.1981).

"Such a right, however, is subject to restriction to the extent clearly necessary to protect the government's interest in security and order within the prison." *Stevens v. Ralston,* 674 F.2d 759, 760 (8th Cir.1982) (per curiam). Where a regulation impinges upon the right to correspond and receive materials from free-world persons, the government must show that the censorship furthers a substantial government interest without unreasonable interference with first amendment rights.[9] *Procunier,* 416 U.S. at 413, 94 S.Ct. at 1811; *Meadows v. Hopkins,* 713 F.2d 206, 210 (6th Cir.

---

analysis of the claimants' free exercise rights, so long as their religious motivation requires them to keep the Sabbath and avoid pork products." *Callahan,* 658 F.2d at 684.

**6.** We observe that there are other belief systems which espouse racial separation or superiority. For example, the Black Muslims appear to hold such views and their religion has been accorded at least some first amendment protection by the courts. *See, e.g., Otey v. Best,* 680 F.2d 1231, 1233–34 n. 3 (8th Cir.1982); *Rogers v. Scurr,* 676 F.2d 1211, 1212 (8th Cir.1982); *Rowland v. Jones,* 452 F.2d 1005, 1006 (8th Cir.1971) (per curiam) (upholding prisoner's access to "Muhammad Speaks," a publication containing statements derogatory of the white race); *Long v. Parker,* 390 F.2d 816, 822 (3d Cir.1968) (same).

**7.** Should the court find that the beliefs are so protected, this would not necessarily mean that the inmates would be entitled to special worship services and visits with their pastor. The free exercise clause only requires that they be given a "reasonable opportunity of pursuing [their] faith comparable to the opportunity afforded fellow prisoners who adhere to conventional

religious precepts...." *Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972). *See also Otey v. Best,* 680 F.2d 1231, 1233 (8th Cir.1982).

**8.** Prisoners "retain those First Amendment rights of speech 'not inconsistent with [their] status as ... prisoner[s] or with the legitimate penological objectives of the corrections system.'" *Hudson v. Palmer,* —— U.S. ——, ——, 104 S.Ct. 3194, 3198, 82 L.Ed.2d 393 (1984) (quoting *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974)).

**9.** *Procunier* also requires that the decision to censor material be accompanied by minimum procedural safeguards. The inmate should be notified when materials sent to him have been withheld and the author of the letter should be given a reasonable opportunity to protest the decision. Complaints should be referred to a prison official other than the person who originally disapproved of the mail. *Procunier,* 416 U.S. at 418–19, 94 S.Ct. at 1814. The extent to which safeguards such as these are utilized at the Cummins Unit at the present time is unclear.

1983); *Jensen,* 648 F.2d at 1182; *Carpenter v. State,* 536 F.2d 759, 761–62 (8th Cir.1976), *cert. denied,* 431 U.S. 931, 97 S.Ct. 2636, 53 L.Ed.2d 246 (1977). Of course, we also recognize that courts should employ an attitude of judicial restraint when dealing with problems of prison administration. *Procunier,* 416 U.S. at 404–05, 94 S.Ct. at 1807. We should hesitate to substitute our judgment for that of the prison officials since they normally must be allowed an area of discretion within which to deal with institutional concerns. *See Bell v. Wolfish,* 441 U.S. 520, 547–48, 99 S.Ct. 1861, 1878–79, 60 L.Ed.2d 447 (1979).

Here, the prison officials contend that the censorship is necessary since the materials and correspondence contain "overtones of racial hatred" which could cause violence within the institution. As an alternative holding, the district court ruled that the officials' actions were reasonable. Apart from this one conclusory statement, however, the court made absolutely no findings on the issue. The district court made no findings that release of the materials would create any kind of clear and present danger to security at the prison or that the censorship otherwise furthered a substantial government interest. *See Thibodeaux v. State,* 553 F.2d 558, 560 (8th Cir.1977). Moreover, the record evidence is unclear whether the materials which were withheld actually advocate violence and therefore constitute a threat to security or whether they merely stress racial purity. Similarly, it is also unclear how much of the material is being withheld and whether the officials are censoring only to the extent necessary. The inmates assert that the administration has imposed a total and complete ban on all mail from church leaders. Clearly a total ban on all literature concerning the churches would be overbroad. On the other hand, materials which advocate violence may properly be excluded.

The lack of evidence and findings on key issues appears related to the inadequacy of the hearing that was afforded the inmates. The inmates were not represented by counsel and their presentation suffered sorely from this deficiency. Although the court attempted to assist Wiggins several times during the course of the proceedings, the record clearly reflects that Wiggins was confused as to proper procedure, and not only did not know how to extract crucial evidence from his own witnesses but obviously he did not cross-examine defense witnesses effectively. Furthermore, Wiggins's motions for discovery were ignored and his request for the subpoena of certain witnesses was denied.

▮ There is no constitutional or statutory right for an indigent to have appointed counsel in a civil case. *Randall v. Wyrick,* 642 F.2d 304, 307 n. 6 (8th Cir.1981) (per curiam); *Watson v. Moss,* 619 F.2d 775, 776 (8th Cir.1980) (per curiam). Nevertheless, federal courts are empowered by statute to appoint counsel when circumstances justify it. 28 U.S.C. § 1915(d); *White v. Walsh,* 649 F.2d 560, 563 (8th Cir.1981); *Manning v. Lockhart,* 623 F.2d 536, 540 (8th Cir.1980) (per curiam). While we certainly do not endorse the appointment of counsel in every § 1983 case, we believe that the inmates present a colorable claim for relief, and it is clear that they are indigent. We believe that they are unable to properly present their case without the assistance of competent counsel. In these limited circumstances, we are persuaded that the district court should not have denied the inmates' request for counsel. *See Peterson v. Nadler,* 452 F.2d 754, 758 (8th Cir.1971) (per curiam). *Cf. Mosby v. Mabry,* 697 F.2d 213, 214–15 (8th Cir.1982) (per curiam) (where plaintiff demonstrated familiarity with caselaw and judicial procedure, failure to appoint counsel not an abuse of discretion).

Furthermore, we also believe that the inmates should be given an opportunity to invoke discovery processes. Although we note that some procedures for the screening of materials are set out in the Inmate Handbook, there is at least some question as to the extent to which prison officials are following those procedures. For exam-

ple, at one point during his testimony Warden Sargent stated that he rejected "[a]ny type of literature that deals with or may have an effect on my general population of my institution." If this is the standard that is being followed, it is tantamount to no standard at all. In contrast, he later stated that he only rejected material which advocated violence.[10] At another point, Warden Norris stated that, to his knowledge, there was no written institutional policy concerning the censorship of literature and correspondence. We believe that the inmates should be given the opportunity to discover what specific guidelines exist, and, more importantly, whether the prison officials are following them in an evenhanded manner.

■ The inmates also contend that they have been denied equal protection. They assert that the Black Muslims believe in racial separation and that the Muslims are allowed to congregate for services and receive materials pertaining to their religion.[11] They argue that the district court erred in not allowing them to subpoena certain Black Muslim witnesses in order to allow them to develop their equal protection claim. We believe that the inmates' contentions may possibly have merit and that they should have been given the opportunity to develop them more fully.[12] *See Manning v. Lockhart,* 623 F.2d at 539.

In sum, on the present record the district court erred in holding that the inmates are entitled to no first amendment protection. Accordingly, we reverse and remand for further proceedings consistent with this opinion. Counsel should be appointed to represent the inmates [13] and they should be allowed reasonably to invoke discovery processes and subpoena witnesses. Following the hearing, the district court should make specific findings and to the extent necessary balance the institutional interests of the prison officials with the first amendment rights of the inmates.

Reversed and remanded with directions.

---

**10.** The Supreme Court has held that a mail regulation which banned "inflammatory political, *racial, religious* or other views" was "not narrowly drawn to reach only material that might be thought to encourage violence...." *Procunier,* 416 U.S. at 416, 94 S.Ct. at 1813 (emphasis added); *see also Aikens v. Jenkins,* 534 F.2d 751, 756–57 (7th Cir.1976). In the present case, therefore, while the prison officials could not rely solely on the racially offensive nature of the material to exclude it, it could properly censor material that reasonably could be thought to encourage violence.

**11.** Courts must closely scrutinize the reasonableness of any restriction which discriminates on the basis of religion. *Native American Council of Tribes v. Solem,* 691 F.2d 382, 384 (8th Cir.1982). The state bears a "heavy burden" in justifying discriminatory practices. *Id.*

**12.** Of course, it is within the district court's discretion to limit the number of witnesses the inmates may subpoena or to refuse to order discovery of materials not relevant to the law-suit. We do not wish to imply that the inmates be given carte blanche authority to abuse the judicial process. We require only that they be given a meaningful opportunity to develop their evidence. The Federal Rules of Civil Procedure, at least to the extent that they provide for interrogatories to parties, requests for admissions, and requests for production of documents, are available to prisoners proceeding without counsel in section 1983 actions on the same terms and conditions as to all other litigants. By the same token, if attempts are made to abuse these discovery devices, the rules contain ample protection for the other side, including objections and motions for protective orders.

**13.** We appointed J. Harrod Berry, Esq. as counsel to represent the inmates on this appeal. We wish to acknowledge the fine service he has rendered both to his clients and to this court. With the termination of this appellate proceeding, Mr. Berry's appointment terminates. Should he prefer not to undertake further service on remand, we suggest that the trial court consider appointing other counsel.