805 F.2d 806
 Vernon Dale TRAVIS, Appellant,
v.
Larry NORRIS, Warden; Marvin Evans, Assistant Warden; and
Sgt. L.C. Sipes, Maximum Security Unit, Tucker,
Arkansas, Appellees.
James Gary WHITTINGTON, Appellant,
v.
Sgt. L.C. SIPES, Mail Supervisor; Marvin Evans, Assistant
Warden Maximum Security Unit, Arkansas Department
of Correction, Tucker, Arkansas, Appellees.
 Nos. 86-1030, 86-1069.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Sept. 12, 1986.
Decided Nov. 18, 1986.
Rehearing Denied Jan. 26, 1987.
 
 Carl J. Madsen, Stuttgart, Ark., for appellants.
 A. Carter Hardage, Little Rock, Ark., for appellees.
 Before HEANEY and BOWMAN, Circuit Judges, and REGAN,* Senior District Judge.
 BOWMAN, Circuit Judge.
 
 
 1
 Vernon Travis and James Whittington appeal from the District Court's order dismissing their complaints for failure to state a claim. They assert First Amendment claims and argue that the District Court erred in holding that the Arkansas Department of Correction may prohibit inmates from receiving a publication entitled Gorilla Law. We affirm.
 
 
 2
 Travis and Whittington are inmates at the Tucker Maximum Security Unit of the Arkansas Department of Correction. Both inmates brought actions under 42 U.S.C. Sec. 1983 seeking damages and injunctive relief, contending that prison officials violated their constitutional rights by confiscating and labeling as contraband a publication entitled Gorilla Law. Defendants moved to dismiss the complaints for failure to state a claim. The District Court consolidated the cases and an evidentiary hearing was held before a magistrate.
 
 
 3
 At the hearing, Warden Norris testified that the publication had been determined to be contraband because it advocated violence and depicted prison life as a constant struggle between inmates and prison officials, thereby creating a serious security concern and inhibiting rehabilitation. The magistrate concluded that the publication did not create a sufficient security risk to warrant keeping it from the inmates, but that the detrimental impact Gorilla Law may have on the rehabilitation of inmates would justify banning the publication. The District Court adopted the magistrate's report and recommendation and dismissed the complaints.
 
 
 4
 The Supreme Court has held that an "inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." Pell v. Procunier, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). Although this holding maintains the integrity of the First Amendment in the prison setting, it is flexible and permits ban of a publication in an institutional setting where the government can show one of several penological interests will be served. Thus, a state may restrict a prisoner's right to read certain materials where "the state can show a countervailing interest warranting censorship." Carpenter v. South Dakota, 536 F.2d 759, 761 (8th Cir.1976), cert. denied, 431 U.S. 931, 97 S.Ct. 2636, 53 L.Ed.2d 246 (1977). In Procunier v. Martinez, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), the Supreme Court listed the following as interests warranting censorship: "the preservation of internal order and discipline, the maintenance of institutional security against escape or unauthorized entry, and the rehabilitation of the prisoners." Id. at 412, 94 S.Ct. at 1811 (footnote omitted); see also Pell, 417 U.S. at 822-23, 94 S.Ct. at 2804-05.
 
 
 5
 Although prison officials have the burden of proving that censorship is necessary, the Court has not required
 
 
 6
 that prison administrators ... be required to show with certainty that adverse consequences would flow from the failure to censor a particular letter. Some latitude in anticipating the probable consequences of allowing certain speech in a prison environment is essential to the proper discharge of an administrator's duty.
 
 
 7
 Martinez, 416 U.S. at 414, 94 S.Ct. at 1811; see also Wiggins v. Sargent, 753 F.2d 663, 668 (8th Cir.1985) (in dealing with censorship of prisoner correspondence, "We should hesitate to substitute our judgment for that of the prison officials since they normally must be allowed an area of discretion within which to deal with institutional concerns.") It is recognized that "Prison officials may not censor inmate correspondence simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements." Martinez, 416 U.S. at 413, 94 S.Ct. at 1811. Moreover, "They may not censor inmate publications that advocate the legitimate use of prison grievance procedures or that urge prisoners to contact public representatives about prison conditions." Guajardo v. Estelle, 580 F.2d 748, 761 (5th Cir.1978).
 
 
 8
 We have carefully considered this body of law in our analysis of the present case. Having done so, we affirm the judgment below. Although Gorilla Law advocates the use of prisoner grievance procedures and urges inmates to exercise their rights, and in that sense is unobjectionable, the tone of the publication is relentlessly hostile to prison officials and to authority in general. It promotes the notion that prisoners are hapless victims of society, and speaks of their "motivation of burning revenge." Gorilla Law at 1.
 
 
 9
 On the cover of Gorilla Law, an angry King-Kong size gorilla stands atop a crumbling building labeled "County Jail." The bars in some of the windows are broken, suggesting that a jailbreak has occurred. Small airplanes labeled "Sheriff" buzz around the gorilla, who, undaunted, has grabbed one of the planes. He holds the plane in one hand, crushing and shaking it while a pop-eyed law enforcement officer sits helplessly in the cockpit. The pamphlet then opens with the following portrait of the prisoner as vengeful victim:
 
 
 10
 I owe a debt of gratitude to all the teachers who failed to teach me, the police and jail workers who beat and stompted [sic] me, the probation and parole officers who found excuses for not listening or lending support, the dump truck lawyers who never provided any semblance of representation, the district attorneys who built their careers on my back, the judges who expediently handed out justice for the sake of the noon recess....
 
 
 11
 Id. at i.
 
 
 12
 Gorilla Law warns that "the information contained in this book could be hazardous to your health and/or psychological well-being," id. at 2, and feeds on feelings of self-pity by reminding the prisoner of "your miserable state of incarceration." Id. at 4. The pamphlet encourages inmates to file multiple complaints with bar associations alleging attorney misbehavior, noting:
 
 
 13
 [T]he jacket that you help create for your favorite attorney will go a long way toward preventing him/her from getting a judicial appointment or an appointment to another governmental post. Nobody like[s] someone with a "dirty jacket"; after all its our jackets as ex-offenders which keeps us from getting good jobs! Right?
 
 
 14
 Id. at 21.
 
 
 15
 It also encourages inmates to file complaints alleging judicial misconduct: "you can take pleasure in knowing that the complaint you filed will add weight to the jacket of this Judge...." Id. at 22. The pamphlet urges prisoners to "use the powers of the state against itself," id. at 7, and points out that filing small claims complaints in local courts is easy and "it only costs $2.00 for the filing fee ... or FREE if you file in forma pauperis." Id. at 24. Urging the prisoner to file as many complaints as possible, the pamphlet asks, "Can you think of a better way to use your AM's and PM's while in the slammer?" Id. The pamphlet further suggests that inmates appeal traffic court convictions in order to become "expert on the subject" of appeals. Id. at 25. It urges the inmate "to turn your friends onto the game," id., and asks the inmate to "Imagine the fun you can have just sitting in jail, organizing your tank, and getting everyone to file appeals." Id.
 
 
 16
 Aside from openly inviting and encouraging prisoners to abuse the judicial process, Gorilla Law expresses attitudes that are diametrically opposed to the goal of rehabilitation, and we cannot say that Warden Norris's concern as to the negative impact of this publication upon rehabilitative efforts was not well founded. The trial court heard the warden's testimony and weighed it in light of its own review of Gorilla Law. A trial court's finding of fact may not be set aside on appeal unless it is determined to be clearly erroneous. Fed.R.Civ.P. 52(a); Anderson v. City of Bessemer City, 470 U.S. 564, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985). After reviewing the record, we are unable to conclude that the District Court's finding regarding Gorilla Law's probable adverse effect on inmate rehabilitation is clearly erroneous. The District Court's judgment is therefore affirmed.[1]
 
 
 17
 HEANEY, Circuit Judge, dissenting.
 
 
 18
 I respectfully dissent.
 
 
 19
 First, it appears that Warden Norris, who banned the booklet, did not read it before he ordered it confiscated as contraband. He testified as follows:
 
 
 20
 Q. What did you do when it [Gorilla Law ] come [sic] to your attention?
 
 
 21
 A. I looked at it, generally scanned over the contents of it.
 
 
 22
 Second, there is not a word of testimony in the record that supports the view that there was any rehabilitation program in the Cummings Unit of the Arkansas prison system. Absent such testimony, it is difficult for me to understand how a nonexistent program can be interfered with.
 
 
 23
 Third, there is no testimony in this record to indicate how the publication would frustrate the goal of a rehabilitation program, if in fact one existed. To the contrary, the Supreme Court has recognized that "the weight of professional opinion seems to be that inmate freedom to correspond with outsiders advances rather than retards the goal of rehabilitation." Procunier v. Martinez, 416 U.S. 396, 412, 94 S.Ct. 1800, 1811, 40 L.Ed.2d 224 (1974). Moreover, the fact that Gorilla Law encourages prisoner complaints is not sufficient grounds for prohibiting it. As the majority recognizes: "Prison officials may not censor inmate correspondence simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements." More specifically, "[t]hey may not censor inmate publications that advocate the legitimate use of prison grievance procedures or that urge prisoners to contact public representatives about prison conditions." Guajardo v. Estelle, 580 F.2d 748, 761 (5th Cir.1978).
 
 
 24
 Fourth, no unit of the Arkansas prison system has a grievance procedure that has been approved by the Department of Justice. Absent a functioning, workable grievance procedure, prison officials must expect that inmates will seek guidance and counselling from any available source. The handling of Whittington's grievance, with respect to the seizure of the pamphlet, in this case is indicative of the short shrift that prison officials give to prisoner grievances. If the grievance procedure in this case is representative of that normally employed in the Arkansas prison system, it is little wonder our Court continues to receive an inordinately high number of prisoner petitions out of the State of Arkansas. In this case, Whittington submitted a grievance as a result of confiscation of a copy of Gorilla Law he had ordered. In return, Whittington received a memorandum stating in its entirety:
 
 
 25
 This is not an emergency situation. You have not been subject to any harm. Upon investigating your complaint, it was found that Sgt. Sipes was not wrong for taking the pamphlets [sic] from your mail. The pamplet [sic] entitled "Gorilla Law" will not be returned to you. The pamplet [sic] has been placed in storage with the remainder of your personal property. Publications of any kind must first be approved by either the Warden or the Assistant Warden before being allowed to be mailed to you. If you do not agree with this decision, you may appeal to the Assistant Director within five (5) working days.
 
 
 26
 The procedure made no provision for Whittington to present his case, nor did it attempt to give any meaningful explanation for the action taken.
 
 
 27
 Fifth, the numerous cases before this Court involving the treatment of prisoners by the Arkansas correction system supports the inmates complaints. They must continuously and vigorously assert their constitutional rights if these rights are to be protected.[1]
 
 
 28
 Sixth, the booklet itself, despite the majority's characterization, is really quite innocuous. Admittedly, the cover of the booklet could be considered somewhat impertinent by prison officials. Yet, the purpose of the illustration and title is to get inmates to read what is otherwise a fairly dry piece of writing. Although I agree that the booklet encourages prisoners to file grievances and offers practical advice along those lines, I cannot agree with the majority's contention that the "tone of the publication is relentlessly hostile to prison officials and to authority in general."
 
 
 29
 In support of its contention, the majority has taken quotations from the booklet out of context in order to support Warden Norris's conclusions as to its effect on whatever rehabilitative programs may exist in the Arkansas prisons. For example, on page five, the majority's opinion quotes from page two of Gorilla Law stating, "Gorilla Law warns that 'the information contained in this book could be hazardous to your health and/or psychological well-being.' " However, the full context of the quoted passage states:
 
 
 30
 [T]his book was written to afford you the choice of grasping the levers of control and creating a new identity for yourself, as opposed to accepting the powerless position you presently hold. Keep in mind that this new identity will demand responsible and respectful action; intelligent and informed decision making; judgment, and, above all, discipline if it is to survive.
 
 A WARNING TO CONSIDER:
 
 31
 The information and strategies contained in this book should not be considered as a game for your amusement. You should not immediately jump up and begin to fire-off letters triggering action without careful planning and organization. Without overstating the issue, keep in mind that the information contained in this book could be hazardous to your health and/or psychological well-being.
 
 
 32
 Read, meditate, discuss, and organize BEFORE you take decisive action! Remember, nothing comes to the sleeper but a dream ... AWAKE!
 
 
 33
 Gorilla Law at 2.
 
 
 34
 The majority's opinion also argues that Gorilla Law "promotes the notion that prisoners are hapless victims of society, and speaks of their 'motivation of burning revenge,' " citing Gorilla Law at 1. The context in which the phrase "motivation of burning revenge" is used, however, is:
 
 
 35
 [W]e possess the power, given the basic tools provided by the system, to effect the kind of change that penal reformists have wolfed on for decades. That is not to say that penal reformists have not tried, but given the same tools, we, with our specialized knowledge, a motivation of burning revenge and expertise, can better use that power to create viable and necessary change within the correctional system. Needless to say, we alone have the most to gain by acting in a positive and responsible fashion.
 
 
 36
 Gorilla Law at 1.
 
 
 37
 Thus, I believe, considered as a whole, Gorilla Law is a harmless document containing nothing more and, in fact, substantially less than one could find in any reasonably maintained prison library.[2]
 
 
 38
 I fully understand the irritation that prison officials feel as a result of the numerous prisoner petitions that are filed. The district court and this Court are equally irritated, particularly because so many of the petitions are frivolous. Experience in other states in this Circuit, however, has demonstrated that prisoner petitions to the United States District Court will decline dramatically if prison conditions meet constitutional standards and if there is an effective, fair and impartial method of resolving grievances internally. We will not improve conditions in the Arkansas prisons nor lessen the number of petitions filed by seizing innocuous pamphlets with provocative titles and pictures to attract the attention of the readers. Progress will not be made as long as prison officials continue to view legitimate prisoner complaints as intolerable threats to institutional security, order, and rehabilitation.
 
 
 39
 For the foregoing reasons, I would reverse the judgment of the district court.
 
 
 
 *
 THE HONORABLE JOHN K. REGAN, United States Senior District Judge for the Eastern District of Missouri, sitting by designation
 
 
 [1]
 The plaintiffs also allege that the District Court erred in finding that Gorilla Law should be considered general correspondence, rather than privileged legal mail. We need not decide this issue. An inmate's privileged legal mail may be opened in the inmate's presence to inspect for contraband. Wolff v. McDonnell, 418 U.S. 539, 576-77, 94 S.Ct. 2963, 2984-85, 41 L.Ed.2d 935 (1974); see also Jensen v. Klecker, 648 F.2d 1179, 1182-83 (8th Cir.1981). Both plaintiffs testified that the packages containing Gorilla Law were opened in their presence. Thus, whether Gorilla Law is considered legal mail or general correspondence, plaintiffs' due process argument is without merit
 
 
 [1]
 See Talley v. Stephens, 247 F.Supp. 683 (E.D.Ark.1965) (enjoining corporal punishment without adequate procedural safeguards and enjoining reprisals against prisoners seeking access to the courts); Jackson v. Bishop, 268 F.Supp. 804 (E.D.Ark.1967) (enjoining use of electronic torture device, "teeter board," and application of any whipping to the bare skin of prisoners), vacated, 404 F.2d 571 (8th Cir.1968) (prohibiting use of whipping strap on prisoners as cruel and unusual punishment); Holt v. Sarver, 309 F.Supp. 362 (E.D.Ark.1970) (finding confinement of persons in Arkansas prison system under conditions including trusty guard system, open barracks, unsafe and unsanitary isolation cells, and lack of any meaningful rehabilitation program, amounts to cruel and unusual punishment in violation of the eighth amendment), aff'd, 442 F.2d 304 (8th Cir.1971); Holt v. Hutto, 363 F.Supp. 194 (E.D.Ark.1973), rev'd sub nom., Finney v. Arkansas Board of Corrections, 505 F.2d 194 (8th Cir.1974) (finding conditions in Arkansas prisons still in violation of the Constitution and ordering, inter alia, the board of corrections to submit an overall program for rehabilitation and treatment of inmates), on remand, 410 F.Supp. 251 (E.D.Ark.1976) (finding conditions of confinement constituted continuing constitutional violations), aff'd sub nom., Finney v. Hutto, 548 F.2d 740 (8th Cir.1977), aff'd 437 U.S. 678 (1978), rehearing denied, 439 U.S. 1122, 99 S.Ct. 1035, 59 L.Ed.2d 83 (1979); Cotton v. Hutto, 540 F.2d 412 (8th Cir.1976) (challenge to conditions of confinement); Freeman v. Lockhart, 561 F.2d 728 (8th Cir.1977) (challenging adequacy of prison medical care); Martin v. Sargent, 780 F.2d 1334 (8th Cir.1985) (challenging constitutionality of conditions of confinement); Wiggins v. Sargent, 753 F.2d 663 (8th Cir.1985) (challenging prohibition of certain religious literature)
 
 
 [2]
 I also note that by engaging in similar piecemeal and out-of-context quotation, Warden Norris testified in the district court that Gorilla Law represented a security threat because it mentioned riots and nonpeaceful demonstrations, planting the seed for such actions in the prison population for such action. The passage Warden Norris was apparently refering to states:
 POSITIVE--vs--NEGATIVE ACTION:
 All sorts of strategies are available for creating change, establishing a power base, and dealing blows to the criminal justice system. For the sake of space, we will consider briefly two kinds of action you can trigger against your oppressors--positive and negative action.
 Negative action, in my mind, centers on non-approved and non-acceptable forms of acquiring power. Riots, use of direct violence, and non-peaceful demonstrations are examples. These are negative forms of action, which is not to say they do not work. The problem is that negative action may bring immediate and desired action; but it also brings negative repercussions such as increased counter-violence and long-term development of negative and more repressive correctional attitudes. You will also risk losing what little community support you may presently have.
 In addition, while negative action may yield results, these results do not enhance the process which supports long-lasting change. As a result, not only is the change effected by negative action likely to be followed by repercussions, counter-violence, and negative correctional actions; but most importantly, the changes accomplished tend to be short-lived.
 Positive action, on the other hand, requires playing the game by the rules estblished by the system. This strategy is desirable for several reasons. Change generated by positive action is more apt to lead to the formation of positive attitudes, win faster support and respect within the community, and more likely endure the test of time because you have utilized the change mechanisms that the existing system was built on. When you consider the difficulty of creating changes, you will appreciate the performance such change carries.
 The district court properly found that Gorilla Law could not be prohibited on the grounds that it posed a security risk.