**Dr. C. Edgar MASON, and Karen L. Mason, Individually, and Dr. C. Edgar Mason as Guardian of Jered Mason, Infant, Plaintiffs–Appellants,**

v.

**GENERAL BROWN CENTRAL SCHOOL DISTRICT, Donald J. Grant, as Superintendent of the General Brown Central School District and William K. Archer, Principal, General Brown Elementary School and Gordon M. Ambach, Commissioner of Education of the State of New York, Defendants–Appellees.**

No. 787, Docket 87–7879.

United States Court of Appeals, Second Circuit.

Argued March 17, 1988.

Decided June 24, 1988.

48

James R. Filenbaum, Spring Valley, N.Y., for plaintiffs-appellants.

Edward Ryan Conan, Syracuse, N.Y. (Elizabeth S. Riker, Bond, Schoeneck & King, Syracuse, N.Y., of counsel), for defendants-appellees General Brown School Dist., Donald J. Grant and William K. Archer.

Alan S. Kaufman, Asst. Atty. Gen. of the State of N.Y. (Robert Abrams, Atty. Gen. of the State of N.Y., Peter H. Schiff, Deputy Solicitor Gen., William J. Kogan, Asst. Solicitor Gen., of counsel), for defendant-appellee Gordon M. Ambach.

Before TIMBERS, PRATT, and MINER, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

Plaintiffs C. Edgar Mason, individually and as guardian for his son, Jered Mason, and Karen L. Mason, appeal from a judgment entered in the United States District Court for the Northern District of New York after a bench trial before Howard G. Munson, Chief Judge, dismissing the complaint. Plaintiffs' action sought to compel

defendants to permit plaintiffs' son, based on his own and his parents' religious beliefs, to attend public school without being immunized as required by New York law. Finding that plaintiffs' opposition to immunization was not religiously based, the trial court held (1) that plaintiffs were not entitled to a religious exemption as provided by N.Y. Pub. Health Law § 2164(9), and (2) that plaintiffs lacked standing to attack § 2164 on first amendment grounds.

Plaintiffs' appeal pivots on their claim that the district court erred in finding that plaintiffs' opposition to immunization was not religiously based. They contend that their commitment to living in a "natural order" is "over and above a level of scientific belief" and argue that the district court erroneously failed to recognize that their commitment to a lifestyle, based on what they perceive as a "genetic blueprint", rises to the level of religious belief. We reject these arguments and affirm.

## I. BACKGROUND

C. Edgar and Karen L. Mason reside with their son Jered within the boundaries of the General Brown Central School District in Watertown, New York. The Masons advocate a "natural existence". They believe, for example, that the human body possesses the means of healing itself without medical intervention, and that, therefore, immunizations are unnecessary and indeed contrary to the "genetic blueprint" intended by nature. Similarly, they are convinced that any interference with natural neurological and physical functions results in decreased physical capacity and increased disease.

Although the record is unclear, Dr. Mason apparently developed these beliefs in the late 1970s while attending chiropractic school in Davenport, Iowa. While there, he became interested in and subsequently joined the Davenport Universal Life Church (DULC), organized by, and consisting mostly of, fellow chiropractors and chiropractic students in Davenport. The DULC is the Davenport local branch of the Universal Life Church (ULC). It has no membership requirements, no worship or other services, and no traditional doctrine. Instead, it advocates a "natural existence" with each member determining "the most effective means of expressing his/her life." Over the past several years since leaving Davenport for New York, the Masons have continued to cultivate their belief in this natural lifestyle: they grow some of their own food, eat as naturally as possible, exercise, meditate, and limit their television viewing.

In a letter dated April 16, 1985, addressed to the officers of the General Brown School District, the Masons explained their beliefs and requested that their son, Jered, be allowed to attend school without the immunizations mandated by N.Y.Pub. Health Law § 2164 (McKinney 1985). This section requires that all children be immunized against certain communicable diseases before they enter school, but provides an exemption to those who oppose immunization on religious grounds. N.Y. Pub. Health Law § 2164(9) (McKinney 1985). In support of their application for exemption, the Masons submitted a letter from the DULC, stating that Jered was a "member in good standing", and that the church opposed immunization because it defiled the human body.

After consideration, the school district refused to grant the exemption, finding that the required vaccinations were not in conflict with the family's religious beliefs. Plaintiffs appealed to the state Commissioner of Education, Gordon M. Ambach, who, while ultimately dismissing the Masons' appeal as untimely, also found that plaintiffs had presented "insufficient evidence" to establish that their religious tenets were inconsistent with immunization.

Thereafter, plaintiffs filed suit in federal district court seeking (1) a declaratory judgment that their beliefs fell within the purview of § 2164(9), (2) a declaration that the state statute is unconstitutional under the first amendment, and (3) damages, pursuant to 42 U.S.C. § 1983, in the amount of $1 million for violation of their constitutional rights as protected under the free exercise clause.

After a bench trial, the district court dismissed the complaint as against commissioner Ambach because it was not properly served, and thereafter entered judgment in favor of all other defendants. First, focusing solely on the Masons' beliefs concerning a "genetic blueprint", the court found that they were not "essentially religious", but rather were a mere "embodiment of chiropractic ethics", and thus primarily scientific in nature. In addition, the court, looking to the organization with which the Masons were affiliated, found there to be "no indicia" that the DULC was a religious organization: the court found "no rights of membership, no requirement of active participation, and, in short, nothing demonstrating that [the DULC] is in fact a bona fide religious order." This conclusion was supported, the court found, by the fact that anyone, by mailing a specific fee to the church, could become an ecclesiastical leader in the DULC: *e.g.*, bishop—$5, mother superior—$5, doctor of philosophy—$100, "church saint"—$5.

Second, as to the plaintiffs' constitutional challenge and claim for damages, the district court held that because plaintiffs' beliefs were scientific, they lacked standing to constitutionally attack § 2164, and had no action for damages under § 1983. Since the "genetic blueprint" beliefs were not religious, the court said, plaintiffs' constitutional right to free exercise of religion was not infringed upon by defendants' requirement that Jered be immunized before he entered school.

This appeal followed.

## II. DISCUSSION

As they did in the district court, plaintiffs attack the school district's refusal to issue an exemption on two fronts. First, they contend that their opposition to immunization is based on religious belief, and that the district court's finding to the contrary is clearly erroneous. Second, the Masons maintain that, as individuals with personal and sincere religious beliefs, they have standing to challenge the constitutionality of § 2164 on first amendment grounds

and to bring an action for damages under § 1983. Neither argument has merit.

### A. *Plaintiffs' Opposition to Immunization.*

N.Y.Pub. Health Law § 2164(7) requires school officials to obtain from each child proof of immunization against certain communicable diseases before that child is allowed to enroll in school. The section also allows for exemption from this requirement: no immunization is required of a child whose parents "are bona fide members of a recognized religious organization whose teachings are contrary to the [immunization]." N.Y.Pub. Health Law § 2164(9) (McKinney 1985). New York courts have construed this exemption broadly, holding that it is sufficient if the child's parents have sincere religious beliefs opposed to immunization. *Maier v. Besser*, 73 Misc.2d 241, 242–43, 341 N.Y.S.2d 411, 412–13 (Sup.Ct. Onondaga Cty. 1972); *Brown v. City School District*, 104 Misc.2d 796, 798, 429 N.Y.S.2d 355, 357 (Sup.Ct. Steuben Cty. 1980), *aff'd mem.*, 83 A.D.2d 755, 444 N.Y.S.2d 878 (4th Dep't 1981). Thus, put simply, in order to claim an exemption under § 2164(9) the Masons must show either (1) that they are members of a recognized religious organization whose teachings conflict with immunization, N.Y.Pub.Health Law § 2164(9) (McKinney 1985), or (2) that their opposition to immunization is a personal and "sincerely followed religious belief[ ]." *Maier*, 73 Misc.2d at 243, 341 N.Y.S.2d at 412; *see Brown*, 104 Misc.2d at 798, 429 N.Y.S.2d at 357. The district court found that the Masons had failed to make a showing under either alternative, and we agree.

#### 1. The Masons' Personal Beliefs.

The Masons claim that, totally apart from their membership in any religious organization, they possess strong convictions concerning the necessity of a "natural existence". This belief, they contend, although based on chiropractic principles, rises "over and above a level of scientific belief" to form a "belief system which in its essence can be deemed religious." Appellants' brief at 12.

There is no doubt, as the district court recognized, that "religious belief" encompasses more than the traditional Judeo-Christian, Moslem or Buddhist forms of worship. *See United States v. Seeger,* 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965); *International Society for Krishna Consciousness, Inc. v. Barber,* 650 F.2d 430, 439–40 (2d Cir.1981). Indeed, we have held that the term "religious" has expanded beyond a strict belief in a deity to include the notion of a person's "ultimate concern." *Krishna Consciousness,* 650 F.2d at 441; *see also United States v. Allen,* 760 F.2d 447, 450 (2d Cir.1985) ("an individual's most sincere beliefs do not necessarily fall within traditional religious categories"); *Seeger,* 380 U.S. at 165–66, 85 S.Ct. at 853–54. As a consequence, to be religious, a belief need not necessarily contemplate an orthodox or traditional God; rather, it is sufficient if the belief "occupies a place in the life of its possessor parallel to that filled by the orthodox belief in God." *Seeger,* 380 U.S. at 166, 85 S.Ct. at 854.

An individual's assertion that the belief he holds has reached this level does not, however, automatically mean that the belief is religious. To the contrary, "a threshold inquiry into the 'religious' aspect of particular beliefs and practices cannot be avoided", *Krishna Consciousness,* 650 F.2d at 433, if we are to determine what is in fact based on religious belief, and what is based on secular or scientific principles. *See Wisconsin v. Yoder,* 406 U.S. 205, 215–16, 92 S.Ct. 1526, 1533–34, 32 L.Ed.2d 15 (1972) (if plaintiffs assert their claim "because of their subjective evaluation and rejection of the contemporary secular values accepted by the majority," their claims do "not rest on a religious basis"); *Callahan v. Woods,* 658 F.2d 679, 683 (9th Cir. 1981) (plaintiffs' claim "must be rooted in religious belief, not in 'purely secular' philosophical concerns"); *Fiedler v. Marumsco Christian School,* 631 F.2d 1144, 1151 (4th Cir.1980) (if the belief asserted is "philosophical and personal rather than religious," or is "merely a matter of personal preference", it is not entitled to protection).

Recognizing these standards, the district court proceeded to evaluate the Masons' belief in a "genetic blueprint". It apparently had little doubt that this belief was sincere, but found that it was based, not on religious grounds, but on scientific and secular theories. This finding is not clearly erroneous.

There is ample evidence in the record suggesting that the plaintiffs' belief, taken on its own merits and considered under the standards illuminated above, is simply an embodiment of secular chiropractic ethics. Dr. Mason received his training from a school, and now is a member of a profession, that teaches a natural view of the human body and which rejects various types of drug and surgical intervention in favor of a belief that "health comes from within." At trial, he expressed his fear of the possible side effects from immunization in medical terms, agreeing that, to a large extent, his position was based on scientific evidence and personal theory. Indeed, when the trial court asked Mason to explain his objection to immunization, Mason candidly stated that it was primarily "biological":

> [E]ach of the substances that are required by the state law for a child to enter school have been shown to cause biological damage to the children that * * * received the innoculation [sic]. In the case of polio, children have actually contracted polio directly because of the Savin [sic] oral vaccine. Diphtheria has been linked very heavily to encephalitis. It's been linked very heavily to hyperactivity in children. The measles and mumps vaccines are both a live virus vaccine which in those particular instances are directly injected into the bloodstream of the human organism that is receiving it and those types of live virus vaccines are violating the three natural defense mechanisms that your body already has in motion to prevent you from getting the disease in the first place.

Testimony of C. Edgar Mason, Jt. App. at 59.

We do not question that the Masons may have strong convictions so far as their be-

lief in a "genetic blueprint" is concerned. These convictions are evidenced by the fact that the Masons have chosen to live in the country, to eat as naturally as possible, and to engage in many other health-oriented activities. However, this choice of lifestyle does not rise to the level of religion. Everyone makes basic choices about where to live, what to eat, and how to raise children. Merely because these decisions are important, and may be supported by strong conviction, does not render them religious. To the contrary, much like Thoreau's choice to isolate himself at Walden Pond, the beliefs are philosophical and personal, and as such, are neither protected by the religion clauses nor exempted under § 2164. *Wisconsin v. Yoder*, 406 U.S. 205, 215–16, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972) ("A way of life, however virtuous and admirable, may not be interposed as a barrier to reasonable state regulation of education if it is based on purely secular considerations; to have the protection of the Religious Clauses, the claims must be rooted in religious belief."); *Maier*, 73 Misc.2d at 242–43, 341 N.Y.S.2d at 412–13 (legislature established a strict religious exemption to § 2164 in order to "prevent individuals from avoiding this health requirement * * * merely because they oppose such medical procedures on the basis of personal moral scruples or by reason of unsupported personal fears").

### 2. The Mason's Membership in the DULC.

█ Of course, as the statute explicitly provides, the Masons may also gain exemption if they are members of a bona fide religious organization whose teachings are contrary to immunization. N.Y.Pub. Health Law § 2164(9) (McKinney 1985). Aware of this, plaintiffs initially concentrated most of their efforts on convincing the defendants that they were bona fide members of the DULC, that the DULC was a recognized religious organization, and that as an organization, it was opposed to immunization. The school authorities refused to accept these suggestions at face value, however, and after research into DULC history and practices, they denied plaintiffs' request on the ground that the DULC was not a religious organization.

Apparently recognizing that tying themselves to such an organization could be more of a liability than an asset, the Masons attempted, at the trial level, to divert the district court's attention from the DULC, focusing instead on their own personal convictions. However, because the Masons relied on their membership in the DULC in initially attempting to convince the school district that they should receive an exemption, and because plaintiffs admitted that their beliefs derived, at least in part, from their interaction with the leaders and members of the DULC, it was entirely appropriate for the district court to examine the organization as part of determining whether Jered should be exempted from the immunization requirements.

This is not the first time that a branch of the ULC has come under a federal court's scrutiny. *See, e.g., United States v. Zimmerman*, 832 F.2d 454 (8th Cir.1987); *United States v. Gleason*, 766 F.2d 1239 (8th Cir.1985), *cert. denied*, 474 U.S. 1058, 106 S.Ct. 801, 88 L.Ed.2d 777 (1986); *Universal Life Church, Inc. v. United States*, 582 F.Supp. 79 (N.D.Cal.1984); *Davis v. Commissioner*, 81 T.C. 806 (1983); *Mendenhall v. Commissioner*, T.C.Memo. 1983–491; *Solanne v. Commissioner*, T.C. Memo. 1983–67; *Murphy v. Commissioner*, T.C.Memo. 1983–59; *Magin v. Commissioner*, T.C.Memo. 1982–383; *Hall v. Commissioner*, T.C.Memo. 1982–337; *Kellman v. Commissioner*, T.C.Memo. 1981–615; *Reimers v. Commissioner*, T.C.Memo. 1981–456; *Brown v. Commissioner*, T.C. Memo. 1980–553. Indeed, in our own circuit, there is case law recognizing that at least some governmental agencies view the ULC as a "total fraud". *United States v. Sundstrom*, 489 F.2d 859, 861 (2d Cir.), *aff'g*, 359 F.Supp. 1252, 1257 (S.D.N.Y. 1973), *cert. denied*, 419 U.S. 934, 95 S.Ct. 205, 42 L.Ed.2d 163 (1974).

The reason for this skepticism is hardly surprising when one examines the organization's history and practices. The ULC, headquartered in Modesto, California, operates through "mail order ministries", a pro-

cess whereby anyone, simply by paying a fee, can be ordained a minister of a local ULC "branch". The ministers have no required duties, nor does the church have any established creed or doctrines. The ULC also issues "mail order church charters" through which as few as three people, all of whom may be members of the same family, can be designated as a "congregation". Once ordained, a minister donates to the church the earnings from his regular occupation by placing the money into his "congregation's" bank account. In so doing, the minister claims a charitable contribution deduction of up to 50 percent of his gross income, with a corresponding reduction in income tax liability. The minister then withdraws money from the account, tax-free, for the upkeep of the "church" (his home), and his living expenses, including food and lodging. *See United States v. Gleason*, 766 F.2d 1239 (8th Cir.1985); *accord United States v. Zimmerman*, 832 F.2d 454 (8th Cir.1987).

The DULC, a chartered branch of the ULC, is an excellent example. Dr. Christopher Kent, a chiropractor, established the branch in November 1978. A "monastery" was established in Dr. Kent's apartment where he resided with his fellow "monk", Edward Summers, a chiropractic student. Although Dr. Kent continued as a full-time professor at a chiropractic school, earning approximately $20,000 annual salary, he took a "vow of poverty" and transferred all of his property to the "church", including personal belongings and chiropractic equipment from his clinic. The "monastery" took over the operation of the clinic, buying an x-ray machine and other equipment, even though Dr. Kent continued working there as a sole practitioner. Similarly, the DULC paid the rent and all of Kent's and Summers' living expenses including the lease of an automobile for their personal use, airplane rental, Dr. Kent's loan payments (including loans for chiropractic equipment), and food. In short, by organizing the DULC, Kent and Summers sought substantial income tax advantages while experiencing little or no change in their day-to-day lives.

Apart from the motives of its organizers and leaders, the organization itself possesses no indicia of a religious group or order. The DULC has no rites of membership, no requirement of active participation, no regular religious meetings, no system of providing guidance to its members, no regular contact between members and leaders, and no indication that it provides any religious services, *i.e.*, marriages, burials, or community and humanitarian aid. *Cf. Washington Ethical Society v. District of Columbia*, 249 F.2d 127, 128 (D.C.Cir.1957). Significantly, anyone with the money can "buy" into the church and obtain any desired ecclesiastical title (including bishop, priest, archbishop, friar, reverend, or rabbi) by doing no more than filling out an application and then writing out a check.

In essence, the DULC appears to exist for only two purposes: to provide a tax dodge for its leaders, *see generally Pollard v. C.I.R.*, 786 F.2d 1063, 1064–65 (11th Cir.1986), and to give "religious" legitimacy to the chiropractic ethics of its members. This is not enough. While it has sometimes been difficult for us to establish precise standards by which the *bona fides* of a religion may be judged, these difficulties have not hindered us in denying protected status to organizations which are "obviously shams and absurdities" and whose leaders "are patently devoid of religious sincerity." *Theriault v. Carlson*, 495 F.2d 390, 395 (5th Cir.), *cert. denied*, 419 U.S. 1003, 95 S.Ct. 323, 42 L.Ed.2d 279 (1974); *see Wiggins v. Sargent*, 753 F.2d 663, 666 (8th Cir.1985); *Callahan v. Woods*, 658 F.2d 679, 683 (9th Cir.1981); *United States v. Carroll*, 567 F.2d 955, 957 (10th Cir.1977); *United States v. Kuch*, 288 F.Supp. 439, 443–44 (D.D.C.1968).

The ULC, and more specifically for purposes of this case, the DULC is such an organization; accordingly, the district court correctly refused to exempt plaintiffs from the requirements of § 2164 because plaintiffs had not shown they were "bona fide members of a *recognized religious organization* whose teachings are contrary to [immunization]." N.Y.Pub. Health Law § 2164(9) (McKinney 1985) (emphasis added).

B. *Plaintiffs' Standing to Challenge § 2164.*

Having upheld the district court's finding that plaintiffs' beliefs are not religious, we now consider whether the Masons could challenge the statute, or the actions of the school authorities in applying it, on first amendment grounds. We note in passing that the clause in § 2164(9) requiring that parents who seek an exemption be "bona fide members of a recognized religious organization" has been held unconstitutional, *see Scherr v. Northport–East Northport Union Free School District,* 672 F.Supp. 81 (E.D.N.Y.1987), and that the state has determined it will not appeal. Brief for Commissioner Ambach at 8 n. 4. As a result, pursuant to New York's separability statute, N.Y.Pub. Health Law § 5000 (McKinney 1985), the "recognized religious organization" clause is automatically excised from subsection 9, leaving a general exemption for any person whose opposition to immunization stems from a sincere religious belief. *Scherr,* 672 F.Supp. at 92.

This does not mean, however, that plaintiffs' argument on this point is entirely moot, because in addition to asking that the exemption be declared unconstitutional, plaintiffs' complaint sought $1 million in damages under 42 U.S.C. § 1983, alleging that defendants had violated plaintiffs' constitutional rights by refusing to grant them an exemption to the immunization requirements. We need not tarry long on this point, however, because it is clear plaintiffs could have suffered no injury to their religious rights as protected under the first amendment. As we held above, the Masons' beliefs in a "natural lifestyle" are scientific, not religious. Consequently, not only did the Masons lack standing to challenge the constitutionality of the exemption, they also had no cause of action under § 1983 because the actions of the school authorities in denying them an exemption, while possibly infringing on their unprotected scientific beliefs, could not have infringed on sincere religious beliefs opposed to immunization.

## III. CONCLUSION

We have considered all of the plaintiffs' other arguments and have found them to be without merit.

Affirmed.