PUBLISH

**UNITED STATES COURT OF APPEALS**

**Filed 9/6/96**

**FOR THE TENTH CIRCUIT**

_____

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
|     Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 95-8079 |
| | ) | |
| DAVID MEYERS, | ) | |
| | ) | |
|     Defendant-Appellant. | ) | |

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING
(D.C. No. 95-CR-58)

_____

David A. Kubichek (David D. Freudenthal, United States Attorney,
Cheyenne, Wyoming, Patrick J. Crank, Assistant United States
Attorney, with him on the briefs), Casper, Wyoming, for appellee.

Thomas B. Jubin, Cheyenne, Wyoming, for appellant.

_____

Before **BALDOCK, BARRETT, and BRORBY,** Circuit Judges.

_____

**BARRETT**, Senior Circuit Judge.

_____

David Meyers (Meyers) appeals from his conviction and sentence

entered following a jury trial wherein he was found guilty of

conspiracy to possess with intent to distribute and to distribute

marijuana, in violation of 21 U.S.C. § 846 (Count I), and aiding and abetting possession with intent to distribute marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 2 (Count II).

<u>Facts</u>

On August 24, 1994, Carl Jones (Jones) purchased four pounds of marijuana from Mitchell Meyers in Tucson, Arizona, which had been arranged by Meyers and coconspirator, Scott Recore (Recore). Jones mailed the marijuana to himself in Casper, Wyoming, in an attempt to avoid discovery. The attempt failed and the marijuana was discovered.

Jones ultimately decided to cooperate and in a series of statements described a marijuana conspiracy allegedly involving himself, Meyers, Richard Federico (Federico) and Mitchell Meyers. Jones' statements provided the basis for Wyoming Division of Criminal Investigation Special Agent Steve Freel's (Agent Freel) testimony and evidence presented to the grand jury. Agent Freel testified to the grand jury that Jones was involved in storing and packaging marijuana in various quantities for Meyers between January and August, 1994, in exchange for payment in the form of one-quarter of a pound of marijuana; it was Meyers who advised Jones and inspected the packages; and Jones made four trips for Meyers and brought back between five and seven pound of marijuana each trip.

- 2 -

On May 19, 1995, Meyers was indicted by a grand jury on Count I and Count II. On August 11, 1995, Meyers pled not guilty and trial was set for October 2, 1995.

Just prior to trial, the government discovered that Jones had lied to investigating officers in his initial statements by omitting Recore's middleman role in the conspiracy and by stating that he dealt directly with Meyers when in fact he dealt primarily with Recore. Jones allegedly lied pursuant to an agreement between Meyers, Recore, and himself which provided that if caught Recore and Jones would intentionally blame Meyers for the entire conspiracy so that Meyers could "try out" his religious freedom defense.

At trial, Jones testified that from January to July, 1994, he would receive between five and seven pounds of marijuana from Recore every seven to ten days; in July, 1994, he traveled to El Paso, Texas, to obtain marijuana from Federico at the direction of Recore, who was acting at the direction of Meyers; and at the end of August, 1994, he traveled to Tucson, Arizona, to meet with Meyers' cousin, Mitchell Meyers, and obtain four pounds of marijuana. Recore testified that he was receiving all the marijuana he distributed to Jones from Meyers and that he was acting at Meyers' direction by delivering the marijuana to Jones.

Before trial, Meyers filed numerous motions including motions to dismiss based on religious freedom under the First Amendment and

the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb et. seq. (RFRA). At the hearing on Meyers' religious freedom defense, Meyers testified that he is the founder and Reverend of the Church of Marijuana and that it is his sincere belief that his religion commands him to use, possess, grow and distribute marijuana for the good of mankind and the planet earth.

After a careful and thorough analysis, the district court concluded that the neutral drug laws at issue were not subject to a First Amendment free exercise challenge and that Meyers' beliefs did not constitute a religion for purposes of the RFRA. United States v. Meyers, 906 F. Supp. 1494, 1509 (D. Wyo. 1995). Therefore, the court denied his motion to raise a RFRA defense.[1]

The jury found Meyers guilty on both counts and he was sentenced to thirty-three months imprisonment, three years supervised release, and assessed $100.

### Issues

On appeal, Meyers contends that: (1) the district court erred in prohibiting his religious freedom defense; (2) the indictment was legally insufficient; (3) the indictment was improperly amended by the proof at trial; (4) he was denied due process by the government's failure to timely inform him or the court of the

---

[1] The district court denied Meyers' motion before trial at the hearing on October 2, 1995. (ROA, Vol. III at 68-70). However, the district court's written Order was filed on November 14, 1995. United States v. Meyers, 906 F. Supp. 1494 (D. Wyo. 1995).

infirmity in the testimony presented to the grand jury; (5) the district court erred in failing to award him a two point reduction in his offense level for acceptance of responsibility; (6) the district court erred in its calculation of the marijuana quantities attributable to him; and (7) the district court erred in failing to timely address the issues of pre-trial release and post-conviction release pending appeal.

Discussion

I. Religious Freedom Defense

Meyers contends that the district court erred in failing to balance his interests in his religion with governmental interests as required by the First Amendment and the RFRA; in refusing to recognize his interpretation of his own religion; and in refusing to give his beliefs the status of religion.

A. Free Exercise Clause

Meyers asserts that as the Reverend of the Church of Marijuana it is his sincere belief that his religion commands him to use, possess, and distribute marijuana for the benefit of mankind and the planet earth and that 21 U.S.C. §§ 841 and 846 and 18 U.S.C. § 2, which prohibit this religiously motivated conduct, unduly burden his constitutional right to free exercise of religion. Meyers maintains that in order to substantially burden religiously motivated conduct, the government must demonstrate a compelling state interest and use means narrowly tailored to achieve that

interest.

The Free Exercise Clause of the First Amendment guarantees that, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . .." U.S. Const. amend. I. In Cantwell v. Connecticut, 310 U.S. 296, 303-04 (1940), the Court recognized that there are two aspects of the free exercise of religion: freedom to believe and freedom to act.

> On the one hand, it forestalls compulsion by law of the acceptance of any creed or the practice of any form of worship. Freedom of conscience and freedom to adhere to such religious organization or form of worship as the individual may choose cannot be restricted by law. On the other hand, it safeguards the free exercise of the chosen form of religion. Thus the Amendment embraces two concepts,-- freedom to believe and freedom to act.

Id. at 303.

While the freedom to believe and profess whatever religious doctrines one desires is absolute, the freedom to act cannot be. Id. at 303-04. "Conduct remains subject to regulation for the protection of society. The freedom to act must have appropriate definition to preserve the enforcement of that protection." Id. at 304.

In Employment Div., Dep't of Human Resources of Or., v. Smith, 494 U.S. 872 (1990), the Court held that the right to free exercise of religion does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes), nor does a generally

- 6 -

applicable criminal prohibition on a particular form of conduct that substantially burdens a religious practice have to be justified by a "compelling governmental interest." (citing United States v. Lee, 455 U.S. 252, 263 n.3 (1982)). In Smith, respondents argued that "their religious motivation for using peyote place[d] them beyond the reach of a criminal law that [was] not specifically directed at their religious practice and that [was] concededly constitutional as applied to those who use the drug for other reasons." 494 U.S. at 878. The respondents further argued "that even though exemption from generally applicable criminal laws need not automatically be extended to religiously motivated actors, at least the claim for a religious exemption must be evaluated under the balancing test set forth in Sherbert v. Verner, 374 U.S. 398 (1963)," where governmental actions that substantially burden a religious practice must be justified by a compelling governmental interest. Smith, 494 U.S. at 882-83.

In reaching its decision, the Court stated that "[w]e have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate." Id. at 878-79. The Court pointed out that "[t]he only decisions in which [it has] held that the First Amendment bars application of a neutral, generally applicable law to religiously motivated action have involved not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with

other constitutional protections." Id. at 881 (citations omitted).

In addition, the Court specifically rejected the respondents contention that a neutral law of general applicability that burdens a religious practice must be justified by a compelling governmental interest. The Court held that:

> The government's ability to enforce generally applicable prohibitions of socially harmful conduct, like its ability to carry out other aspects of public policy, "cannot depend on measuring the effects of a governmental action on a religious objector's spiritual development." Lyng [v. Northwest Indian Cemetery Protective Assn., 485 U.S. 439, 451 (1988)]. To make an individual's obligation to obey such a law contingent upon the law's coincidence with his religious beliefs, except where the State's interest is "compelling--permitting him, by virtue of his beliefs, "to become a law unto himself," Reynolds v. United States, 98 U.S. [145], 167 [1878]-- contradicts both constitutional traditions and common sense.

Id. at 885 (footnote omitted).

In our case, Meyers' challenge to his convictions under the Free Exercise Clause must fail. First, as in Smith, Meyers challenges the application of valid and neutral laws of general applicability on the grounds that they prohibit conduct that is required by his religion. Therefore, we hold that Meyers' challenge fails for the same reasons as the respondents challenge in Smith failed, i.e., the right to free exercise of religion under the Free Exercise Clause of the First Amendment does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law incidentally affects religious practice. Second, we hold that when, as here,

- 8 -

the challenge is to a valid neutral law of general applicability, the law need not be justified by a compelling governmental interest.  See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 521 (1993).

## B.  RFRA

Meyers argues that the district court erred in refusing to recognize his interpretation of his own religion and in refusing to give his beliefs the status of religion under the RFRA.

In response to the Court's rejection of the compelling governmental interest test in Smith, Congress passed the RFRA re-establishing the compelling interest test of Sherbert, 374 U.S. 398, and Wisconsin v. Yoder, 406 U.S. 205 (1972), as the analytical framework governing all cases where free exercise of religion is substantially burdened.  42 U.S.C. § 2000bb(b)(1).

The RFRA provides that "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section."  § 2000bb-1(a).  Subsection (b) provides that:

> Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person--
> (1) is in furtherance of a compelling governmental interest; and
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000bb-1(b).

Under the RFRA, a plaintiff must establish, by a preponderance of the evidence, three threshold requirements to state a prima facie free exercise claim. Thiry v. Carlson, 78 F.3d 1491, 1494 (10th Cir. 1996). The governmental action must (1) substantially burden, (2) a religious belief rather than a philosophy or way of life, (3) which belief is sincerely held by the plaintiff. Id. The government need only accommodate the exercise of actual religious convictions. Werner v. McCotter, 49 F.3d 1476, 1479 n.1 (10th Cir.) (citing Yoder, 406 U.S. at 215-19; Thomas v. Review Bd., 450 U.S. 707, 713-18 (1981)), cert. denied, ___ U.S. ___, 115 s. Ct. 2625 (1995). Once the plaintiff has established the threshold requirements by a preponderance of the evidence, the burden shifts to the government to demonstrate that the challenged regulation furthers a compelling state interest in the least restrictive manner. Werner, 49 F.3d at 1480 n.2 (citing 42 U.S.C. § 2000bb-1(b)).

Our review of the requirements, although largely factual in nature, presents mixed questions of fact and law. Thiry, 78 F.3d at 1495. We review the meaning of the RFRA de novo, including the definitions as to what constitutes substantial burden and what constitutes religious belief, and the ultimate determination as to whether the RFRA has been violated. Id. Sincerity is a factual matter and, as with historical and other underlying factual determinations, we defer to the district court's findings,

reversing only if those findings are clearly erroneous.  <u>Id</u>.

There is no dispute that Meyers' beliefs are sincerely held and that they are substantially burdened by 21 U.S.C. §§ 841 and 846 and 18 U.S.C. § 2.  The issue is whether his sincerely held beliefs are "religious beliefs," rather than a philosophy or way of life.  In analyzing this issue, the district court examined the cases that have delved into the question of "what is religion" and catalogued the many factors used to determine whether a set of beliefs is religious in nature.[2]  <u>Meyers</u>, 906 F. Supp. at 1501. The court then used its list of factors to examine Meyers' beliefs to determine if his beliefs fit the factors sufficiently to be included in the realm of "religious beliefs."

Keeping in mind that the threshold for establishing the

---

[2]      The district court "gleaned" many of these factors from the following cases: <u>Africa v. Commonwealth of Pa.</u>, 662 F.2d 1025 (3rd Cir. 1981), <u>cert</u>. <u>denied</u>, 456 U.S. 908 (1982); <u>Malnak v. Yogi</u>, 592 F.2d 197 (3rd Cir. 1979); <u>United States v. Sun Myung Moon</u>, 718 F.2d 1210 (2nd Cir. 1983), <u>cert</u>. <u>denied</u>, 466 U.S. 971 (1984); <u>Founding Church of Scientology of Washington, D.C. v. United States</u>, 409 F.2d 1146 (D. C. Cir.), <u>cert</u>. <u>denied</u>, 396 U.S. 963 (1969); <u>Washington Ethical Soc'y v. District of Columbia</u>, 249 F.2d 127 (D.C. Cir. 1957); <u>United States v. Kauten</u>, 133 F.2d 703 (2nd Cir. 1943); <u>Sherr v. Northport-East Northport Union Free Sch. Dist.</u>, 672 F. Supp. 81 (E.D.N.Y. 1987); <u>Jacques v. Hilton</u>, 569 F. Supp. 730 (D.N.J. 1983), <u>aff'd</u>, 738 F.2d 422 (3rd Cir. 1984); <u>Church of the Chosen People v. United States</u>, 548 F. Supp. 1247 (D. Minn. 1982); <u>Womens Services, P.C. v. Thone</u>, 483 F. Supp. 1022 (D. Neb. 1979), <u>aff'd</u>, 636 F.2d 206 (8th Cir. 1980), <u>vacated</u>, 452 U.S. 911 (1981); <u>Stevens v. Berger</u>, 428 F. Supp. 896 (E.D.N.Y. 1977); <u>Remmers v. Brewer</u>, 361 F. Supp. 537 (S.D. Iowa 1973), <u>aff'd</u>, 494 F.2d 1277, <u>cert</u>. <u>denied</u>, 419 U.S. 1012 (1974); <u>United States v. Kuch</u>, 288 F. Supp. 439 (D.D.C. 1968); <u>Fellowship of Humanity v. Alameda County</u>, 315 P.2d 394 (Cal. Ct. App. 1957).

religious nature of his beliefs is low, the court considered the following factors:

1.  *Ultimate Ideas*: Religious beliefs often address fundamental questions about life, purpose, and death. As one court has put it, "a religion addresses fundamental and ultimate questions having to do with deep and imponderable matters." Africa, 662 F.2d at 1032. These matters may include existential matters, such as man's sense of being; teleological matters, such as man's purpose in life; and cosmological matters, such as man's place in the universe.

2.  *Metaphysical Beliefs*: Religious beliefs often are "metaphysical," that is, they address a reality which transcends the physical and immediately apparent world. Adherents to many religions believe that there is another dimension, place, mode, or temporality, and they often believe that these places are inhabited by spirits, souls, forces, deities, and other sorts of inchoate or intangible entities.

3.  *Moral or Ethical System*: Religious beliefs often prescribe a particular manner of acting, or way of life, that is "moral" or "ethical." In other words, these beliefs often describe certain acts in normative terms, such as "right and wrong," "good and evil," or "just and unjust." The beliefs then proscribe those acts that are "wrong," "evil," or "unjust." A moral or ethical belief structure also may create duties -- duties often imposed by some higher power, force, or spirit -- that require the believer to abnegate elemental self-interest.

4.  *Comprehensiveness of Beliefs*: Another hallmark of "religious" ideas is that they are comprehensive. More often than not, such beliefs provide a telos, an overreaching array of beliefs that coalesce to provide the believer with answers to many, if not most, of the problems and concerns that confront humans. In other words, religious beliefs generally are not confined to one question or a single teaching. Africa, 662 F.2d at 1035.

5.  *Accoutrements of Religion*: By analogy to many of the established or recognized religions, the presence of the following external signs may indicate that a particular set of beliefs is "religious":

- 12 -

a. *Founder, Prophet, or Teacher*: Many religions have been wholly founded or significantly influenced by a deity, teacher, seer, or prophet who is considered to be divine, enlightened, gifted, or blessed.

b. *Important Writings*: Most religions embrace seminal, elemental, fundamental, or sacred writings. These writing often include creeds, tenets, precepts, parables, commandments, prayers, scriptures, catechisms, chants, rites, or mantras.

c. *Gathering Places*: Many religions designate particular structures or places as sacred, holy, or significant. These sites often serve as gathering places for believers. They include physical structures, such as churches, mosques, temples, pyramids, synagogues, or shrines; and natural places, such as springs, rivers, forests, plains, or mountains.

d. *Keepers of Knowledge*: Most religions have clergy, ministers, priests, reverends, monks, shamans, teachers, or sages. By virtue of their enlightenment, experience, education, or training, these people are keepers and purveyors of religious knowledge.

e. *Ceremonies and Rituals*: Most religions include some form of ceremony, ritual, liturgy, sacrament, or protocol. These acts, statements, and movements are prescribed by the religion and are imbued with transcendent significance.

f. *Structure or Organization*: Many religions have a congregation or group of believers who are led, supervised, or counseled by a hierarchy of teachers, clergy, sages, priests, etc.

g. *Holidays*: As is etymologically evident, many religions celebrate, observe, or mark "holy," sacred, or important days, weeks, or months.

h. *Diet or Fasting*: Religions often prescribe or prohibit the eating of certain foods and the drinking of certain liquids on particular days or during particular times.

I. *Appearance and Clothing*: Some religions prescribe the manner in which believers should maintain their physical appearance, and other religions prescribe

the type of clothing that believers should wear.

      j.   *Propagation*: Most religious groups, thinking that they have something worthwhile or essential to offer non-believers, attempt to propagate their views and persuade others of their correctness. This is sometimes called "mission work," "witnessing," "converting," or proselytizing.

Meyers, 906 F. Supp. at 1502-03 (footnotes omitted).

The district court emphasized that "it cannot rely solely on established or recognized religions to guide it in determining whether a new and unique set of beliefs warrants inclusion" and that "no one of these factors is dispositive, and that the factors should be seen as criteria that, if minimally satisfied, counsel the inclusion of beliefs within the term 'religion.'" Id. at 1503. However, in accord with Yoder, the court noted that "[p]urely personal, political, ideological, or secular beliefs probably would not satisfy enough criteria for inclusion." Id. at 1504. See Yoder, 406 U.S. at 216 (philosophical and personal beliefs are secular beliefs); Africa, 662 F.2d at 1036 (finding beliefs are secular not religious); Berman, 156 F.2d at 380-81 (beliefs which are moral and social are not religious); Church of the Chosen People, 548 F. Supp. at 1253 (beliefs which are sexual and secular are not religious).

After carefully examining Meyers' beliefs derived from his testimony, the district court concluded that his beliefs were secular and, thus, did not constitute a "religion" for RFRA purposes. Meyers, 906 F. Supp. at 1509. The court concluded that:

- 14 -

> Marijuana's medical, therapeutic, and social effects are secular, not religious. . . . Here, the Court cannot give Meyers' "religious" beliefs much weight because those beliefs appear to be derived entirely from his secular beliefs. In other words, Meyers' secular and religious beliefs overlap only in the sense that Meyers holds secular beliefs which he believes so deeply that he has transformed them into a "religion."
>
> While Meyers may sincerely believe that his beliefs are religious, this Court cannot rely on his sincerity to conclude that his beliefs rise to the level of a "religion" and therefore trigger RFRA's protections. Meyers is, of course, absolutely free to think or believe what he wants. If he thinks that his beliefs are a religion, then so be it. No one can restrict his beliefs, and no one should begrudge him those beliefs. None of this, however, changes the fact that his beliefs do not constitute a "religion" as that term is uneasily defined by law. Were the Court to recognize Meyers' beliefs as religious, it might soon find itself on a slippery slope where anyone who was cured of an ailment by a "medicine" that had pleasant side-effects could claim that they had founded a constitutionally or statutorily protected religion based on the beneficial "medicine."

Id. at 1508. Finally, the court noted that "Meyers' professed beliefs have an ad hoc quality that neatly justify his desire to smoke marijuana." Id. at 1509.

We agree with the district court. Under the district court's thorough analysis of the indicia of religion, which we adopt, we hold that Meyers' beliefs more accurately espouse a philosophy and/or way of life rather than a "religion." The district court did not err in prohibiting Meyers' religious freedom defense.

## II. Sufficiency of Indictment

Meyers declares that the district court erred in failing to

grant his motion to dismiss the indictment on the grounds that it was legally insufficient. Meyers reasons that Agent Freel's testimony was insufficient to support the indictment because it consisted almost entirely of a hearsay recitation of false statements made by Jones and that with the deletion of this false information from the indictment, there is insufficient evidence to form the basis of the indictment. We review the sufficiency of an indictment de novo. United States v. Bolton, 68 F.3d 396, 400 (10th cir. 1995), cert. denied, ___ U.S. ___ (1996).

As a preliminary matter, "the validity of the indictment is not affected by the character of the evidence considered." United States v. Calandra, 414 U.S. 338, 344-45 (1974).

> If indictments were to be held open to challenges on the ground that there was inadequate or incompetent evidence before the grand jury, the resulting delay would be great indeed. The result of such a rule would be that before trial on the merits a defendant could always insist on a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury. This is not required by the Fifth Amendment. An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by a prosecutor, if valid on its face, is enough to call for trial of the charge on the merits. The Fifth Amendment requires nothing more.

Costello v. United States, 350 U.S. 359, 363 (1956) (footnotes omitted). Therefore, we are concerned only with whether an indictment meets the minimal constitutional standards which we determine by practical rather than technical considerations. Bolton, 68 F.3d at 400; United States v. Dahlman, 13 F.3d 1391,

1400 (10th Cir. 1993), cert. denied, ___ U.S. ___ (1994).

Generally, an indictment is sufficient "'if it contains the elements of the offense charged, putting the defendant on fair notice of the charge against which he must defend, and if it enables a defendant to assert an acquittal or conviction in order to prevent being placed in jeopardy twice for the same offense.'" Bolton, 68 F.3d at 400 (quoting United States v. Staggs, 881 F.2d 1527, 1530 (10th Cir. 1989), cert. denied, 493 U.S. 1020 (1990)).

In this case, the indictment adequately informed Meyers of the charges against him; therefore, we hold it was valid on its face and cannot be attacked further. Notably, because conspiracy does not require the government to establish any overt acts, Meyers' contention that the overt acts alleged in the indictment were false is irrelevant. See United States v. Johnson, 42 F.3d 1312, 1319 (10th Cir. 1994) ("Under the drug conspiracy statute, the government need not prove the commission of any overt act in furtherance of the conspiracy.") (citing United States v. Shabani, 115 S. Ct. 382, 385 (1994)).

III.  Improper Amendment of Indictment

Meyers contends that the district court erred in denying his motion to dismiss on the grounds that the indictment was improperly amended by the proof at trial.  Meyers asserts that the government presented facts at trial which were materially and substantially

- 17 -

different from the facts presented to the grand jury and that this variance is reversible error.

A variance arises when the evidence presented at trial establishes facts which are different from those alleged in the indictment. <u>Dunn v. United States</u>, 442 U.S. 100, 105 (1979); <u>United States v. Powell</u>, 982 F.2d 1422, 1431 (10th Cir. 1992), <u>cert</u>. <u>denied</u>, 507 U.S. 946 (1993). However, no variance occurs when the government's theory on which the case was tried is the same as that charged in the indictment. <u>Dunn</u>, 442 U.S. at 106. Moreover, even if a variance exists, we will not reverse unless the variance affects the defendant's substantial rights. <u>Powell</u>, 982 F.2d at 1431; <u>United States v. Harrison</u>, 942 F.2d 751, 759 (10th Cir. 1991) ("variance did not affect defendant's right to a fair trial").

Here, the indictment charged that:

> On or about between January, 1994, through and including November, 1994, in the District of Wyoming and elsewhere, **DAVID MEYERS, MITCHELL MEYERS, and RICHARD FEDERICO,** Defendants herein, and Carl Jones, did intentionally, knowingly, and unlawfully combine, conspire, confederate, and agree together, and with other persons, both known and unknown to the Grand Jury, to possess with the intent to distribute, and to distribute, marijuana, a Schedule I controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).

(ROA, Vol. I, Tab 1 at 1-2). The indictment further alleged that marijuana was obtained from Arizona, Texas, and New Mexico, from Mitchell Meyers, Federico, and others at the direction of Meyers for distribution by him, <u>id</u>. at 2; Meyers would either personally

- 18 -

transport the marijuana or arrange for others to do so, id.; and Meyers introduced Jones, or made arrangements for the introduction, to Meyers' sources of marijuana with the intent that Jones begin transporting marijuana for him. Id. at 3.

This is the same theory on which the case was tried and submitted to the jury. Therefore, we hold that there was no variance between the charging indictment and the evidence established at trial. The fact that the government presented additional evidence of the existence of a middleman in the conspiracy, Recore, who was unknown to the grand jury, is immaterial.

In addition, Meyers has failed to assert how any alleged variance affected a substantial right. In fact, he could not do so since he was aware at all times of the existence of Recore and Recore's role in the alleged conspiracy. Therefore, he could not be prejudiced or denied a fair trial merely because the government uncovered another member of the conspiracy who agreed to cooperate.

IV. Due Process

Meyers contends that he was denied due process by the government's failure to timely inform him and the court of the fact that Jones' pre-trial statements, which were presented to the grand jury through Agent Freel's testimony, were false. Meyers asserts that where an indictment is obtained by false testimony to the

grand jury, due process requires the government to immediately inform the court and opposing counsel and, if the "perjury" is material, to inform the grand jury. Meyers maintains that the proper remedy is to dismiss the indictment.

In order to prevail on a due process claim, a defendant must show actual prejudice. A due process violation "require[s] a specific showing of identifiable prejudice of the accused affecting his substantial rights." United States v. Comosona, 614 F.2d 695, 697 n.3 (10th Cir. 1980) (citations omitted).

It is undisputed that although the indictment contained false statements based on Jones' false representations to Agent Freel, there was no actual perjury committed and the government did not know the statements were false at the time they were presented to the grand jury. Therefore, this is clearly not a case involving any type of prosecutorial misconduct, abuse, bad faith, or vindictiveness.

Additionally, Meyers has failed to show how he was prejudiced as a result of this infirmity. Indeed, it is hard to imagine how Meyers could be prejudiced by any alleged failure of the government to inform him of Jones' false statement inasmuch as Jones' false statement concerned Meyers' actions. Meyers should know what he did and did not do in the course of the conspiracy. In fact, if Recore's trial testimony is to be believed, then it is Meyers who is to blame for the inaccurate testimony presented to the grand

jury, because it was he who told Jones to implicate him as the main conspirator. See (ROA, Vol. IV at 369). Therefore, we hold that Meyers was not denied due process and that the extraordinary remedy of dismissing the indictment shall not be imposed here.

## V. Acceptance of Responsibility

Meyers contends that the district court erred in failing to award him a two point reduction in his offense level for acceptance of responsibility under U.S.S.G. § 3E1.1(a). Meyers states that he is entitled to a two point reduction in his offense level based on his pre-trial statements "clearly demonstrating a recognition and affirmative acceptance of personal responsibility for his criminal conduct."

To receive such a reduction, the defendant must prove by a preponderance of the evidence that he has clearly demonstrated acceptance of responsibility for his offense. United States v. Ivy, 83 F.3d 1266, 1292 (10th Cir. 1996). "Whether the defendant has clearly demonstrated acceptance of responsibility is a factual question we review only for clear error." Id. See United States v. Robertson, 45 F.3d 1423 (10th Cir.), cert. denied, ___ U.S. ___ (1995). In so doing, "we remain mindful that '[t]he sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility. For this reason the determination of the sentencing judge is entitled to great deference on review.'" Ivy,

83 F.3d at 1292-93.

In general, pleading not guilty and requiring the government to prove guilt at trial demonstrates denial of responsibility, regardless of how easily the government can prove guilt. United States v. Portillo-Valenzuela, 20 F.3d 393, 394-95 (10th Cir.), cert. denied, ___ U.S. ___ (1994). However, in "rare situations," a defendant may deserve the reduction for acceptance of responsibility even though he goes to trial. Id. at 394; U.S.S.G. 3E1.1 note 2.

Based on our review, we hold that this is not one of those "rare situations." Meyers' pre-trial testimony at the hearing regarding his religious freedom defense did not rise to the level of an acceptance of responsibility for the criminal conduct charged in the indictment. Although he admitted that he used marijuana and distributed it to others as part of the Church of Marijuana, he specifically denied distributing marijuana to Jones and he refused to answer other questions specifically relating to the charges in the indictment. (ROA, Vol. III at 54). In fact, Meyers testified that he actively tried to discourage Jones from trafficking in marijuana. Id. at 62, 64, and 65. Therefore, the government had to prove guilt at trial and, in essence, specifically disprove Meyers' statements. Accordingly, the district court did not err in denying Meyers a two point reduction in his offense level for

acceptance of responsibility.[3]

## VI.  Quantity of Marijuana

Meyers maintains that the district court erred in calculating the quantity of marijuana attributable to him.  He asserts that the district court erred by including ten pounds of marijuana related to Connie Griffis, by double counting three pounds of marijuana involved in a transaction on July 19, 1994, and by over counting three pounds of marijuana from Federico's testimony.

The government has the burden of proving the quantity of marijuana for sentencing purposes by a preponderance of the evidence.  United States v. Garcia, 994 F.2d 1499, 1508 (10th Cir. 1993); United States v. Ortiz, 993 F.2d 204, 207 (10th Cir. 1993).  "We review this determination under a clearly erroneous standard, and we will not disturb it unless it has no support in the record, or unless after reviewing all the evidence we are firmly convinced that an error has been made."  United States v. Cook, 949 F.2d 289, 296 (10th Cir. 1991).

The district court found that Meyers' relevant conduct in the conspiracy involved 83 pounds of marijuana or 38 kilograms;

---

[3]  The government asserts that Meyers was offered a conditional plea that would have preserved his right to pursue any legal issues he wished under the RFRA.  This would also supports our conclusion that the district court's denial of a reduction in offense level for acceptance of responsibility was not error; however, we cannot find any evidence in the record to support the government's assertion.

therefore his base offense level was 18. If we accept Meyers' assertions as true his relevant conduct would be 67 pounds or 30 kilograms. Under U.S.S.G. § 2D1.1(c) 20 kilograms (44 pounds) to 40 kilograms (88 pounds) of marijuana correlates to a base offense level of 18.[4] Therefore, Meyers' base offense level under his own calculations would also be 18. Thus, this issue is without merit.

## VII. Bail and Release

Meyers contends that the district court erred in failing to address his motions for pretrial release, in denying him pretrial release, and in failing to address his motion for post-conviction release pending appeal.

On May 19, 1995, and on June 2, 1995, the government filed a Motion for a Detention Hearing and invoked the rebuttable presumption under 18 U.S.C. § 3142(e) that no conditions of release will assure defendant's appearance and the safety of the community. On July 10, 1995, Meyers was arrested in Colorado apparently on the warrant issued in Wyoming on May 19, 1995. On July 11, 1995, Meyers appeared before Colorado Magistrate Judge O. Edward Schlatter and was remanded to the custody of the United States Marshall. On July 14, 1995, Meyers' waived his right to an identity hearing with no right to a preliminary hearing. At the

---

[4] Under the measurement conversion table provided, one pound of marijuana equals 0.4536 kilograms. U.S.S.G. § 2D1.1 Application Note 10.

same time, Colorado Magistrate Judge Richard M. Borcher found that Meyers was a danger to the community and ordered that he be detained and transferred to the charging district, Wyoming.

Meyers was arraigned in the District Court for the District of Wyoming on August 11, 1995. The minutes of the arraignment reflect that a motion for bond was to be filed and heard at a later date; however, no date was set. On August 14, 1995, Meyers filed a Motion for Pretrial Release and on September 12, 1995, Meyers filed a Second Motion for Pretrial Release.

Trial commenced October 2, 1995, and the jury returned a verdict of guilty on both counts on October 5, 1995. That afternoon, the district court held a hearing on Meyers' outstanding motions for pretrial release. The district court denied the motions on the grounds that Meyers' has a history of failing to appear and that he was a flight risk especially since he had already been convicted. (ROA, Supp. Vol. I at 8 & 12).

On December 1, 1995, Meyers was sentenced to 33 months imprisonment and three years of supervised release. On December 12, 1995, Meyers filed a notice of appeal and, simultaneously, a motion for release pending appeal. There has been no ruling on Meyers' December 12, 1995, motion for release by either the district court or this court.

A. Pretrial Release

Under 18 U.S.C. § 3142(f)(1)(C), the judicial officer shall

hold a detention hearing upon motion by the government in a case that involves an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act, 21 U.S.C. §§ 801 et. seq. "The hearing shall be held immediately upon the person's first appearance before the judicial officer unless that person, or the attorney for the Government, seeks a continuance." 21 U.S.C. § 3142(f).

The district court failed to hold a pretrial detention hearing in a timely manner.[5] While the failure to provide Meyers with the hearing demanded by the statute is unfortunate, it is not a sufficient reason to require mandatory release of the defendant. United States v. Montalvo-Murillo, 495 U.S. 711 (1990). By the same token, it is not a sufficient justification to reverse Meyers' otherwise valid convictions. See also United States v. Rivera, 837 F.2d 906, 925 (10th Cir. 1988), vacated, 900 F.2d 1462 (10th Cir. 1990) (failure of the district court to comply with statutory requirements is not sufficient reason to dismiss all charges).

The district court erred in failing to timely address Meyers' pretrial release motions. However, because Meyers was convicted on both counts, the error was harmless and the issue is now moot. See

_____

[5] The district court was untimely because (1) it did not hold a detention hearing within five days of Meyers' initial appearance in its court, see 18 U.S.C. § 3142(f), and (2) if Meyers' motions for a pretrial release are construed as "appeals" of the Colorado magistrate judge's denial of bond, the motions were not determined promptly as required by 18 U.S.C. § 3145(b).

<u>Montalvo-Murillo</u>, 495 U.S. at 722 (harmless error analysis applies to § 3142 review).

### B. Release on Appeal

Since the detention hearing occurred after Meyers was convicted and the district court based its ruling, in part, on the fact that Meyers had already been convicted, we will treat Meyers' December 12, 1995, motion as an appeal to this court of the district court's denial of post-conviction release under 18 U.S.C. § 3145(c).[6] Our "review of detention or release orders is plenary as to mixed questions of law and fact and independent, with due deference to the district court's purely factual findings." <u>United States v. Stricklin</u>, 932 F.2d 1353, 1355 (10th Cir. 1991).

In <u>United States v. Affleck</u>, 765 F.2d 944, 952-53 (10th Cir. 1985), we held that in order to grant bail pending appeal, a court must find that (1) the defendant has met his burden of proving by clear and convincing evidence that he is not likely to flee or pose a danger to the safety of any other person or to the community if released under § 3143(b)(1), and (2) he has established by a preponderance of the evidence that the appeal is not for purpose of delay, the appeal raises a substantial question of law or fact, and

---

[6]    Although the filing of a notice of appeal usually divest the district court of further jurisdiction, the initial determination of whether a convicted defendant is to be released pending appeal is to be made by the district court. <u>United States v. Affleck</u>, 765 F.2d 944, 954 (10th Cir. 1985). <u>See</u> <u>also</u> Fed. R. App. P. 9 Advisory Committee Notes, Subdivision (b).

if that substantial question is determined favorably to defendant on appeal, the decision is likely to result in reversal or an order for a new trial of all counts on which imprisonment has been imposed.

Here, the district court found that Meyers had a history of failing to appear and that he posed a significant flight risk. We conclude that the district court's findings are amply supported by the record and that Meyers has failed to establish that he has satisfied the criteria required for release stated in § 3143(b). Therefore, the district court's denial of bail pending appeal is affirmed.

**AFFIRMED.**

No. 95-8079 -- UNITED STATES v. MEYERS

**BRORBY**, Circuit Judge, respectfully dissenting.

Because I do not believe it is the proper role of the court to establish a factor-driven test to be used to define what a religion is, I respectfully dissent from my colleagues. The ability to define religion is the power to deny freedom of religion. The ethereal and personal nature of religion has posed problems for most courts that have attempted to define it. *See Wiggins v. Sargent*, 753 F.2d 663, 666 (8th Cir. 1985) ("The determination of whether a belief is religious or not is an extremely delicate task which must be approached with caution."); *Africa v. Pennsylvania*, 662 F.2d 1025, 1031 (3rd Cir. 1981) ("[j]udges are ill-equipped to examine the breadth and content of an avowed religion"), *cert. denied,* 456 U.S. 908 (1982); *United States v. Kauten*, 133 F.2d 703, 708 (2d Cir. 1943) (recognizing that the definition of religion "is found in the history of the human race and is incapable of compression into a few words"); *see also Brown v. Dade Christian Schools, Inc.*, 556 F.2d 310 (5th Cir. 1977) (judges filed two concurrences and two dissenting opinions in a case attempting to define religion in order to determine whether a religious school's policy of racial discrimination was

religious or social or political in nature), *cert. denied,* 434 U.S. 1063 (1978).

In *Wisconsin v. Yoder*, 406 U.S. 205, 215-16 (1972), the Supreme Court held that religious beliefs are distinct from philosophical and personal choices but failed to provide a test or a definition against which lower courts could hold the religious claims of petitioners to determine whether the claims warrant constitutional protection. Many courts have felt compelled by the distinction made in *Yoder* to establish a definition of religion. *See United States v. Ward*, 989 F.2d 1015, 1017 (9th Cir. 1992); *Quaring v. Peterson*, 728 F.2d 1121, 1123 (8th Cir. 1984), *aff'd*, 472 U.S. 478 (1985); *Africa*, 662 F.2d at 1031. We, however, had declined to do so until now. In *Werner v. McCotter*, 49 F.3d 1476, 1479 n.1 (10th Cir.), *cert. denied*, 115 S. Ct. 2625 (1995), we recognized the distinction in *Yoder* and then found "[a] plaintiff, however, need not hew to any particular religious orthodoxy; it is enough for the plaintiff to demonstrate that a government has interfered with the exercise or expression of her or his own deeply held faith." *Id.* at 1480. I believe an approach that prevents the courts from evaluating the

orthodoxy and expression of the individual is the approach most in keeping with the mandates of the Constitution and the Supreme Court. For, it seems to me that the free exercise of religion which we are all guaranteed by the First Amendment necessarily includes the rights of individuals to define their own religion. Accordingly, it is an unproductive and unnecessarily invasive exercise for the courts to attempt to evaluate an individual's religious claims and practices against any set standard of preconceived notions of what types of religious beliefs are valid of being recognized by the courts. In fact, in the conscientious objector context, the Supreme Court has held

> "Men may believe what they cannot prove. They may not be put to the proof of their religious doctrines or beliefs. Religious experiences which are as real as life to some may be incomprehensible to others." Local boards and courts in this sense are not free to reject beliefs because they consider them "incomprehensible."

*United States v. Seeger*, 380 U.S. 163, 184-85 (1965) (quoting *United States v. Ballard*, 322 U.S. 78, 86 (1944)). By attempting to evaluate another's religion with a factor-driven test we have essentially gutted the Free Exercise Clause of its meaning and are ignoring the Supreme Court's cautionary words that a person's views can be "incomprehensible" to the

- 3 -

court and still be religious in his or her "own scheme of things." *Id.*

In an early opinion addressing the Constitutional meaning of "religion," the Supreme Court first recognized that the word religion is not defined in the Constitution and then turned to Thomas Jefferson's views that

> "religion is a matter which lies solely between man and his God; that he owes account to none other for his faith or his worship; that the legislative powers of the government reach actions only, and not opinions, -- I contemplate with sovereign reverence that act of the whole American people which declared that their legislature should 'make no law respecting an establishment of religion or prohibiting the free exercise thereof,' thus building a wall of separation between church and State. Adhering to this expression of the supreme will of the nation in behalf of the rights of conscience, I shall see with sincere satisfaction the progress of those sentiments which tend to restore man to all his natural rights, convinced he has no natural right in opposition to his social duties."

*Reynolds v. United States*, 98 U.S. 145, 164 (1878). The Court then held that Jefferson's words "may be accepted almost as an authoritative declaration of the scope and effect of the amendment thus secured. Congress was deprived of all legislative power over mere opinion, but was left free to reach actions which were in violation of social duties or

subversive of good order."  *Id.; see also, Ballard*, 322 U.S. at 87 (noting the intent of the "fathers of the Constitution" to provide for the "the widest possible toleration of conflicting views" and protection of religious beliefs, even those deemed incredible or preposterous by most people); *Davis v. Beason*, 133 U.S. 333, 342 (1890) ("[w]ith man's relations to his Maker and the obligations he may think they impose, and the manner in which an expression shall be made by him of his belief on those subjects, no interference can be permitted"). The Court expressed the same sentiment in *Cantwell v. Connecticut*, 310 U.S. 296, 303-04 (1940), when it held

> The constitutional inhibition of legislation on the subject of religion has a double aspect.  On the one hand, it forestalls compulsion by law of the acceptance of any creed or the practice of any form of worship.  Freedom of conscience and freedom to adhere to such religious organization or form of worship as the individual may choose cannot be restricted by law.  On the other hand, it safeguards the free exercise of the chosen form of religion. Thus the Amendment embraces two concepts, -- freedom to believe and freedom to act.  The first is absolute but, in the nature of things, the second cannot be.

The absoluteness of the freedom to believe and the freedom to exercise a chosen form of religion is significantly diluted by a court sponsored inquiry into what the individual believes and how he or she expresses those beliefs.  Although the

factors provided by the majority opinion arguably are content neutral, they still require an individual to provide evidence concerning what he or she believes and how he or she expresses those beliefs so that the courts may then judge whether the beliefs and practices are acceptable enough to be labeled a "religion" under our definition.  Such scrutiny clearly usurps the individual's right to believe and to express those beliefs however he or she chooses.

The Supreme Court has also cautioned that a determination of what is a religious belief or practice is "not to turn upon a judicial perception of the particular belief or practice in question; religious beliefs need not be acceptable, logical, consistent or comprehensible to others in order to merit First Amendment protection."  *Thomas v. Review Bd. of Indiana Employment Sec. Div.*, 450 U.S. 707, 714 (1981).  Furthermore, "it is no business of courts to say that what is a religious practice or activity for one group is not religion under the protection of the First Amendment."  *Fowler v. Rhode Island*, 345 U.S. 67, 70 (1953); *see also Hernandez v. Commissioner,* 490 U.S. 680, 693 (1989) ("under the First Amendment, the IRS can reject otherwise valid claims of religious benefit only on

the ground that a taxpayers' alleged beliefs are not sincerely held, but not on the grounds that such beliefs are inherently irreligious").  By applying a broad factor- driven test as advocated by the majority opinion, the subjective perceptions of the court are necessarily invoked in evaluating whether what the individual claims to be religious is indeed religious.  It also requires the court to judge the practices of the individual to see if they are indeed "religious."  This test clearly violates the spirit, if not the intent, of the First Amendment.

The Second Circuit relied on the works of American philosopher William James to define religion as:

> "the feelings, acts, and experiences of individual men in their solitude, so far as they apprehend themselves to stand in relation to whatever they may consider the divine."  W. James, The Varieties of Religious Experience 31 (1910).  In referring to an individual's relation to what he considers the divine, Professor James used the word 'divine' in its broadest sense as denoting any object that is godlike, whether it is or is not a specific deity. *Id*. at 34.  Therefore, under the Religion Clauses, everyone is entitled to entertain such view respecting his relations to what he considers the divine and the duties such relationship imposes as may be approved by that person's conscience, and to worship in any way such person thinks fit so long as this is not injurious to the equal rights of others.

*United States v. Moon*, 718 F.2d 1210, 1227 (2d Cir. 1983),

*cert. denied*, 466 U.S. 971 (1984). I believe this definition comes the closest to capturing the inherently elusive, spiritual and personal nature of religion. I also believe that under such a definition it is inappropriate, if not impossible, to evaluate or analyze the religious beliefs of an individual under a factor-driven approach. The appropriateness of the above definition lies in its openness, which also makes it unworkable as a standard for those seeking concrete guidance in this area.

It seems to me the better practice is not to engage in any type of an attempt to define religion and instead to assume, without deciding, the validity of an individual's sincerely held religious beliefs for purposes of constitutional protection. *See Smith v. Board of Sch. Comm'rs of Mobile County*, 827 F.2d 684, 689 (11th Cir. 1987) (assuming secular humanism is a religion for purposes of the Establishment Clause); *United States v. Middleton*, 690 F.2d 820, 824 (11th Cir. 1982) (assuming Ethiopian Zion Coptic Church is a valid religion), *cert. denied*, 460 U.S. 1051 (1983); *see also Jones v. Bradley,* 590 F.2d 294, 296-97 (9th Cir. 1979) (assuming members of the Universal Life Church are

entitled to First Amendment protection). Under this approach if an individual makes a claim that a government law substantially burdens his or her sincere religious beliefs I would assume the validity of the religion without analyzing the tenets or practices of the religion to see if they fit some preconceived vision of what a religion is. This approach may seem radical; however, it is the only way we can assure an individual the absolute freedom to worship what he or she chooses in the way in which he or she chooses. It is important to note that such a practice would not send us down a "slippery slope" or create a mass shield which any criminal could use to thwart prosecution for crimes done in the name of religion. It has never been the law in this country that religious beliefs prevent the government from regulating criminal or other harmful actions of individuals. *Cantwell*, 310 U.S. at 303. Under the Religious Freedom and Restoration Act, after raising the defense of religion, the individual must show that his or her religious beliefs are sincerely held and were substantially burdened. If this showing is made, then the government may still prevail if it shows that such burden is necessary to further a compelling government interest and that the law is the least restrictive means of

furthering that interest.  42 U.S.C. § 2000bb-1.  This law enforces the absolute freedom of the individual to believe and worship whatever he or she chooses, but clearly prevents him or her from freely acting on these beliefs in ways that are harmful to others.

In this case, I would assume the validity of Mr. Meyers' religious beliefs and affirm the district court's findings that these beliefs are sincerely held and substantially burdened by the laws in question.  Although I am confident that the government will have no problem meeting its burden of proof, *Olsen v. DEA*, 878 F.2d 1458, 1462-63 (D.C. Cir. 1989) (government has a compelling interest in regulating the use of marijuana and is not required to accommodate sacremental use), *cert. denied*, 495 U.S. 906 (1990), it has not yet been given an opportunity to do so.  Therefore, in accordance with the requirements of 42 U.S.C. § 2000bb-1, I would reverse the district court's findings that Mr. Meyers' sincerely held beliefs are not religious and I would remand to allow the government an opportunity to meet its burden of showing that the laws involved serve a compelling government interest and are the least restrictive means of meeting that interest.  *See*

*United States v. Bauer*, 84 F.3d 1549, 1559 (9th Cir. 1996).