UNITED STATES of America

v.

**Robert Ian TRAINER**

No. CR. 99–0531.

United States District Court,
D. Maryland.

June 3, 2003.

Daphene Rose McFerren, Office of the US Attorney, Greenbelt, MD, for Plaintiff.

Robert Trainer, Pro se.

## MEMORANDUM OPINION

CHASANOW, District Judge.

After serving a thirty-five month sentence for Conspiracy Against Rights (18 U.S.C. § 241)[1], Robert Trainer is on supervised release for three years. He is being supervised by the United States Probation Office in the Eastern District of Virginia because he is living in Burke, Virginia. When he requested permission to travel out of the Northern Virginia area to Newport News, Virginia, to visit John King, a member of the World Church of the Creator (WCOTC or Creativity), the probation officer denied the travel request and initiated discussions as to whether Mr. Trainer should be prohibited from associating at all with other members of WCOTC.[2] When Mr. Trainer declined to agree to such an additional condition, the probation officer asked her counterpart in Maryland to seek a court order adding a condition that Mr. Trainer be prohibited from affiliating and/or participating with any white supremacist groups. Attached to the modification petition were documents purporting to set forth the principles of the WCOTC. The court then reinstituted the appointment of Mr. Arcangelo Tuminelli for Mr. Trainer and scheduled a hearing, which was held on May 14, 2003. Mr. Trainer opposes the proposed restriction on his activities on the ground that he has a First Amendment right to practice his religion.

At the hearing, Mr. Trainer testified as to his understanding of Creativity and his wishes regarding participation. He first became a member of the group a little more than a year ago while in prison, where books and literature were allowed, but not chapel time. He noted that the group now goes by the name "Creativity" due to a trademark dispute. As he understands it, there are five fundamental beliefs: (1) race is the religion, (2) the white race is nature's finest, and is superior to all others, though not meant to rule, (3) racial treason is a serious crime (such as the mixing of races), (4) what is good for the white race is the greatest good; what is bad for the white race is evil or a sin, and (5) Creativity is the only salvation for the white race. He said that Creativity does not approve of any illegal acts and cannot impose its beliefs on others. One tenet of the Creativity is to spread its beliefs and there are no other members of the Creativity in his area in Virginia. He wanted to travel to Newport News to begin to distribute literature door to door. His beliefs influence every minute of his life, including, for example, a decision not to eat at McDonald's because it supports non-white immigration. His understanding of the Racial Holy War espoused by

---

1. The offense involved a cross burning at Bowie High School in June 1997. Mr. Trainer acknowledged that the purpose of the cross burning was to threaten and intimidate African–American students attending the high school and the community.

2. Mr. Trainer apparently agreed to a travel restriction routinely imposed on supervisees in the Alexandria Division. The condition imposed by this court's order was that he not leave the judicial district. The sentencing guidelines suggest that a standard condition include that the defendant not leave the judicial district "or other specified geographic area" without the permission of the court or probation officer. USSG § 5D1.3 (c)(1).

Creativity is a war of words or ideas, not violence or guns. He acknowledged that his own personal ideas might be different than those of his "church," such as the use of racial epithets or slurs. While he does not use such terms in his private life, he thinks the church would not be concerned about the effect such language would have on people of color. He believes that the church would not approve of cross burning.

Thus far, while on supervised release, Mr. Trainer has spoken on the phone and communicated by e-mail with other members, and members have traveled to see him in Northern Virginia. He has discussed actions to be undertaken by Reverend King and himself, such as reserving rooms in public libraries and speaking to groups there. When asked about practices of the group other than spreading its beliefs, he mentioned recognizing holy days with a cultural festival between December 25 and January 1, celebrating the winning of the west. Members celebrate such events as one would celebrate a birthday, and have not yet devised public displays.

Mr. Trainer requested, and was given an opportunity until Friday, May 23, to provide the court with supporting written materials challenging the written submissions of the probation office. The court has not received any supplemental information, and, thus, the materials submitted by the Probation Office remain uncontradicted. A thirteen page reprint entitled *World Church of the Creator*, but lacking publication information, reflects that the WCOTC was founded in 1993 by Ben Klassen and that Matthew Hale assumed leadership in 1996. Its ideology is "White Supremacy" and the materials outline the violent history of the organization. The probation office also provided print-outs of internet material from January 16, 2003. One page

reports the arrest of Mr. Hale on charges of conspiracy to murder a federal judge. *Activism–The Creativity Movement Activism Resources,* at http://churchfliers.com/index.shtml (accessed January 16, 2003). On The Creativity Movement's web site, under "Frequently Asked Questions," a one sentence description of the objective of Creativity is: "The Survival, Expansion and Advancement of the White Race." *The Creativity Movement,* at http://www.creator.org/faq/ (accessed January 16, 2003).

Pending a final decision, the court directed that Mr. Trainer not participate in any public activities of the Creativity, emphasizing that he is not to go door to door in an effort to encourage others to join, and that he is not meet with more than one other member of Creativity at a time. For the reasons that follow, those restrictions will be made a permanent condition of Mr. Trainer's supervised release.

A person who is on supervised release is subject to significant restrictions on liberty:

> The sentencing court may impose "any ... condition [of supervised release] that it considers to be appropriate," 18 U.S.C.A. §§ 3583(d)(1)-(3) (West 2000 & Supp.2001), as long as any special condition is:
>
> (1) ... reasonably related to the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), and (a)(2)(D);
>
> (2) involves no greater deprivation of liberty than is reasonably necessary for the purposes set forth in section 3553(a)(2)(B), (a)(2)(C), and (a)(2)(D); and
>
> (3) is consistent with any pertinent policy statements issued by the Sentencing Commission pursuant to 28 U.S.C. 994(a).

The purposes mentioned in §§ 3583(d)(2), and set out in 18 U.S.C.A. §§ 3553(a)(2) (West 2000), are "the need

for the sentence imposed ... to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C.A. §§ 3553(a)(2); *see United States v. Bee,* 162 F.3d 1232, 1235 (9th Cir.1998). The district court's decision to impose special conditions of supervised release is reviewed for abuse of discretion. *United States v. Crandon,* 173 F.3d 122, 127 (3d Cir.1999), *cert. denied,* 528 U.S. 855, 120 S.Ct. 138, 145 L.Ed.2d 118 (1999).

*United States v. Henson,* 22 Fed.Appx. 107 (4th Cir.2001). The court also recognized that:

> A special condition of supervised release may restrict fundamental rights when the special condition "is narrowly tailored and is directly related to deterring [the defendant] and protecting the public." *Id.* at 128. Restrictions affecting constitutional rights " 'are valid if directly related to advancing the individual's rehabilitation and to protecting the public from recidivism.' " *Id.* [*United States v. Crandon,* 173 F.3d 122, 127 (3d Cir.1999), *cert. denied,* 528 U.S. 855, 120 S.Ct. 138, 145 L.Ed.2d 118 (1999) ] (quoting *United States v. Ritter,* 118 F.3d 502, 504 (6th Cir.1997)).

*Id.*

Imposition of a supervised release condition is not without limits. As pointed out by the Second Circuit in *United States v. A–Abras Inc.,* 185 F.3d 26 (2d Cir.1999):

> [T]he conditions of supervised release imposed by trial courts have run the gamut. For example, courts have imposed limits on offenders' associational freedoms, *see, e.g., United States v. Tolla,* 781 F.2d 29, 31–36 (2d Cir.1986) (religion teacher convicted of income tax

evasion barred from teaching young people), and have required offenders to engage in various forms of community service, *see, e.g., United States v. Danilow Pastry Co.,* 563 F.Supp. 1159, 1166–72 (S.D.N.Y.1983) (bakery convicted of Sherman Act violations required to donate fresh baked goods to needy organizations). Other conditions defy easy categorization. *See, e.g., People v. McDowell,* 59 Cal.App.3d 807, 130 Cal. Rptr. 839, 842–44 (1976) (generally approving of condition that convicted purse snatcher wear tap shoes so as to alert prospective victims). Still, appellate courts have vacated conditions attached to probation that were not justifiable within the rationales of offender rehabilitation and public protection. One category that has met with mixed results is where the condition is imposed to shame an offender. The instinct of some sentencing judges to shame an offender has roots derived from Puritan days, when Hester Prynne, convicted of adultery, was required as a condition of her probation to wear the scarlet letter "A," elaborately embroidered on the breast of her gown. *See* Nathaniel Hawthorne, *The Scarlet Letter* 52 (Dodd, Mead & Co.1948). A more recent example in the same genre, struck down on appeal, required an offender to wear a T-shirt reading "I am on felony probation for theft." *People v. Hackler,* 13 Cal. App.4th 1049, 16 Cal.Rptr.2d 681, 682, 686–87 (1993). Some shaming conditions of probation have been enforced. *See generally* Stephen P. Garvey, *Can Shaming Punishments Educate?,* 65 U. Chi. L.Rev. 733 (1998) (collecting cases). Examples of conditions not passing appellate muster include: the condition that a narcotics offender not sire children other than by his wife, *see United States v. Smith,* 972 F.2d 960, 961–62

(8th Cir.1992); the condition that an offender make reparation where the harm in question was caused by crimes to which a co-defendant and not the offender had pled guilty, *see Fiore v. United States,* 696 F.2d 205, 208–10 (2d Cir.1982); and the condition that a convicted draft dodger donate a pint of blood to the Red Cross, *see Springer v. United States,* 148 F.2d 411, 415–16 (9th Cir.1945).

Mr. Trainer considers his membership in Creativity to be the practice of religion. He cites to *Peterson v. Wilmur Communications, Inc.,* 205 F.Supp.2d 1014 (E.D.Wis.2002), as a case in which Creativity was found to be a religion under the functional test used for Title VII of the Civil Rights Act, 42 U.S.C. § 2000e–2(a). That court concluded that Title VII differentiates between employment actions based on religious (a) observance or practice and (b) beliefs. In that context, an adverse action based on religious beliefs is prohibited altogether. Employment actions based on religious observance or practice, on the other hand, may be justified by a showing either that the employer reasonably accommodated the observance or practice or that accommodation of the observance or practice would result in an undue hardship for the employer. A similar distinction can be made in this case. In other settings, the distinction is readily recognized in applying the Free Exercise Clause of the First Amendment:

> While the freedom to believe and profess whatever religious doctrines one desires is absolute, the freedom to act cannot be.

*United States v. Meyers,* 95 F.3d 1475, 1480 (10th Cir.1996), citing *Cantwell v. Connecticut,* 310 U.S. 296, 303–04, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

Even if Creativity is considered to be a religion, the court may still limit a practice, although not a belief, as long as the condition is reasonably related to the goals of supervision. When analyzed as such, it becomes similar to conditions on freedom of association, also protected by the First Amendment. As stated above, the fact that a condition affects a fundamental right is not dispositive.

In *United States v. Showalter,* 933 F.2d 573 (7th Cir.1991), the court upheld a condition that a person convicted of possessing an unregistered firearm "not participate in, or associate with those who do participate in, the organization known as 'skinheads,' or in any neo-Nazi organization." In doing so, the court cited with approval *Malone v. United States,* 502 F.2d 554, 555 (9th Cir.1974), which upheld a condition that a person convicted of unlawful exportation of firearms to the United Kingdom not participate in any American Irish Republican movement, not belong to any Irish organization, not participate in any Irish Catholic organization, not visit any Irish pub, and not accept employment that would associate him with any Irish organization. A parolee was properly barred from associating with the Hell's Angels or any other "outlaw motorcycle gang" in *LoFranco v. United States Parole Commission,* 986 F.Supp. 796 (S.D.N.Y.1997). Other cases imposing or upholding limitations on association include *United States v. Sines,* 303 F.3d 793 (7th Cir.2002) (prohibiting contact with former roommate, with whom the criminal conduct occurred); *United States v. Bortels,* 962 F.2d 558 (6th Cir. 1992) (prohibiting defendant from associating with fiancé because crime arose from that association); *United States v. Crea,* 968 F.Supp. 826 (E.D.N.Y.1997) (prohibiting association with convicted felons as against a First Amendment challenge).

Mr. Trainer is just beginning his transition from prison to liberty. He has successfully completed his community service, is employed, and is attending the anger management classes as directed by the probation officer. He is reporting as required and understands the limitations on his travel. He is not, however, in the court's view, mature enough to judge wisely the wisdom of the outreach practices proposed or to choose where and when to attempt to enlist others.

At this stage of his transition, he will be free of court strictures to the extent that he may read and discuss the principles of Creativity, with another person of like beliefs, one on one. He may not, however, meet with more than one other person at a time, and may not conduct any outreach efforts designed to enlist others to his beliefs. The crime he committed now nearly 6 years ago was motivated by racial discrimination, and was committed as part of a conspiracy, where the collective action made the conduct much more dangerous. While on supervised release, with the ultimate goal of rehabilitation and deterrence, it makes no sense to permit Mr. Trainer to participate in public displays of white supremacist beliefs which could well spark conflicts with people who don't share those beliefs. Having been willing to act in a criminal way before to express his feelings, Mr. Trainer should take the time on supervised release to contemplate how wrong that prior action was.

Accordingly, the court amends Mr. Trainer's conditions of supervision to add that he is prohibited from meeting with more than one person at a time to discuss Creativity and he is prohibited from participating in any outreach programs.